739 So.2d 957 (1999)
STATE of Louisiana
v.
Michael DITCHARO.
No. 98-KA-1374.
Court of Appeal of Louisiana, Fifth Circuit.
July 27, 1999.
*959 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Alison Wallis, Ron A. Austin, Assistant District Attorneys, Gretna, Louisiana, Attorneys for Plaintiff/Appellee.
W. Robert Gill, Kathy Flynn Simino, Manasseh, Hildum & Gill, Baton Rouge, Louisiana, Attorneys for Defendant/Appellant.
Panel composed of Judges SOL GOTHARD, THOMAS F. DALEY and MARION F. EDWARDS.
GOTHARD, Judge.
Defendant, Michael Ditcharo, appeals his conviction and sentence in this criminal matter. For reasons that follow, we affirm the conviction, and remand the matter for sentencing on the aggravated battery conviction.
On August 14, 1997, the Jefferson Parish District Attorney filed a bill of information charging Michael Ditcharo with one count of aggravated oral sexual battery (count one), in violation of LSA-R.S. 14:43.4, and one count of aggravated battery (count two), in violation of LSA-R.S. 14:34. On August 18, 1997, the defendant was arraigned and entered a plea of not guilty. At the conclusion of a subsequent jury trial, the defendant was found guilty as charged. The defendant filed a motion *960 for post-judgment verdict of acquittal, which the trial judge denied. An habitual offender bill of information was filed on March 20, 1998, the allegations of which were denied by the defendant on the same day. A hearing on the habitual offender bill of information was held on June 22, 1998. At the conclusion of the hearing, the trial judge took the matter under advisement. On August 14, 1998, the trial judge found the defendant to be a triple felony offender and imposed an enhanced sentence of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. The trial judge provided written reasons for her finding which were read and filed into the record. The defendant's trial attorney objected to both the finding that the defendant was a triple felony offender and the enhanced sentence.[1] On the same date, the defendant filed a motion to reconsider his sentence, which was denied by the trial judge on November 20, 1998. Defendant filed a timely motion for appeal which was granted by the trial court.
During the trial, various witnesses testified for the state. Their testimony established the following facts. In May of 1997, Officers Mitchell, Rotherham and O'Neil, employed with the Jefferson Parish Sheriff's Office, were working on a Metro Agency Serial Homicide Task Force which was investigating violence directed at prostitutes. As part of the investigation, the officers were showing various prostitutes in the Fourth Street area a group of photographs in an effort to find out whether any of these subjects had been harassing the women. Officers Mitchell and Rotherham interviewed a prostitute named Jocelyn D. Jocelyn identified the defendant's photograph as depicting the individual who had picked her up and attacked her the evening before. Officer Mitchell testified that further investigation revealed that the defendant had attacked another prostitute, April H. Officer Mitchell also showed April several photographic lineups, and she identified the defendant as the man who had picked her up and attacked her. Officer Mitchell identified State Exhibit numbers One through Five as the photographs that he showed to the two women. Based on the information provided by April and Jocelyn, warrants were issued for the defendant's arrest. Officers Mitchell and Rotherham identified the defendant in court.
April testified that she used to be a prostitute who worked on Fourth Street, and that she was a drug addict at that time. She testified that the defendant picked her up on Fourth Street by asking her if she wanted a "date," which she explained was the lingo used in the prostitution business, drove her down Nine Mile Point Road, and forced her to perform oral sex upon him by holding a gun to her head and threatening to kill her. April, who was too scared to report the incident, was initially approached and interviewed in May of 1997 by Officer O'Neil, who was working on the task force investigation which, up until that point, did not involve April. Officer O'Neil showed her a group of five photographs, whereupon April identified the defendant's photograph and told him that the defendant had held her at gunpoint and forced her to perform oral sex upon him.
During the trial, April was shown State Exhibit numbers One through Five, and she stated that they were the same photographs that she was shown by the police. Some time after she spoke with the police, April saw the defendant, who lived across the street from her sister's boyfriend, and she called Officer Mitchell to advise him of such. After receiving the notice that April had seen the defendant, Officer Mitchell visited her at her home and showed her the same five photographs that she had previously viewed. April identified her initials on the back of State Exhibit number Five, which was the photograph of the *961 defendant, as well as the date, which was June 11, 1997. April identified the defendant in court as the man who held her at gunpoint and forced her to perform oral sex upon him.
On July 23, 1997, April was shown two additional photographic lineups. She identified her initials on the backs of State Exhibit numbers Fourteen and Fifteen. She testified that she was unable to identify anyone in State Exhibit number Fourteen, but that she selected photograph number two (the defendant's photograph) of State Exhibit number Fifteen as depicting the man who had held her at gunpoint and forced her to perform oral sex upon him. April testified that she had never seen or met the defendant prior to the evening that he picked her up. April admitted that she gave a statement to Officer Mitchell, and she testified that she knew that the defendant had held a black gun to her head, but that she wasn't sure what kind of gun it was. April initially denied that she had any convictions, but when confronted with proof in the form of certified copies of documents evidencing her convictions, she admitted that she had convictions for theft, forgery and crime against nature.
Jocelyn also testified, and she admitted that she had abused drugs since she was thirteen years old, but claimed that she no longer abused drugs. Jocelyn explained that she was at a bar trying to make some money as a prostitute, when a man stopped his car and asked her if she wanted to make some money. After replying that she did, Jocelyn got into the car with the man. The man drove the vehicle about two blocks, but when Jocelyn asked what he wanted to do, the man began "talking crazy" and making derogatory comments about Fourth Street prostitutes. Jocelyn claimed that she told the man to bring her back to the bar, but that the man had a knife in his hand and used it to scrape her face. In her efforts to escape, Jocelyn claimed that her finger was also cut.
Jocelyn explained that she ran back to the bar and that someone called the police. Officer "Rick" Wiedenhaft, employed with the Jefferson Parish Sheriff's Office, testified that on the evening of May 28, 1997, he and his partner were driving down Fourth Street when they noticed Jocelyn speaking animatedly with a black man. They stopped to investigate the situation, spoke with Jocelyn and noticed that she had some cuts on her head and her finger. Officer Wiedenhaft testified that Jocelyn told him that she had just gotten in a car with a man and that he had stabbed her.
On May 29, 1997, Officer Mitchell interviewed Jocelyn and showed her a group of five photographs. She identified State Exhibit numbers One through Five as the photographs that the officers showed her, and she testified that one of the pictures depicted the man she had identified. Jocelyn testified that she was shown the same photographic lineup on two more occasions, and that she identified the same person each time. She identified the defendant in court as the man who had cut her with a knife. Jocelyn also identified State Exhibit numbers Fourteen and Fifteen as the final photographic lineups that she was shown on August 28, 1997. She identified her initials on the backs of State Exhibit numbers Fourteen and Fifteen. She testified that she was unable to identify anyone in State Exhibit number Fourteen, but that she selected photograph number two in State Exhibit number Fifteen as depicting the man who had cut her with a knife.
On May 17, 1997, following his arrest, the defendant was advised of his constitutional rights, waived said rights, and agreed to give an audio-taped interview. The transcription of the defendant's statement reflects that he denied picking up a white female in the 5000 block of Fourth Street at approximately 2:30 a.m. on March 12, 1997, driving the woman to Nine Mile Point Road, holding her at gunpoint and forcing her to perform oral sex upon him. The transcription of the defendant's *962 statement also reflects that he denied picking up a black female on Fourth Street on May 28, 1997, and that he denied that he was involved in an altercation with a black female during which she was cut with a knife. When asked whether he knew anyone that looked like himself, the defendant named Bradley Fox.
Officer Mitchell testified that when he asked the defendant whether he owned a gun, the defendant indicated that he did not. However, Officer Mitchell testified that a search warrant was executed at the defendant's residence and that State Exhibit number Thirteen was the gun and holster that were discovered during said search.
Following the defendant's interview, Officer Mitchell compiled two new photographic lineups, one including the defendant's photograph and one including Bradley Fox's photograph. Neither of the two victims were able to identify anyone in the lineup including Fox's photograph, but both women again identified the defendant's photograph.
Officer Rotherham, who was working with Officer Mitchell on May 29, 1997, testified that when shown the five photographs, Jocelyn immediately identified the defendant's photograph and told them that the defendant had picked her up, driven a few blocks away and then produced a knife. Officer Rotherham explained that the information Jocelyn provided was relayed to the supervisor of the task force, who at that time was located a little more than a mile away speaking to April.
Jocelyn admitted that she had a prior conviction. When asked whether she was arrested on May 28, 1997, she responded that she could not remember because she was always high. She testified that she could not remember the exact date that the defendant attacked her, but that she remembered that it happened. When shown a certified copy of a document reflecting that she was arrested on May 28, 1997 for possession of a controlled dangerous substance, she still could not remember whether that was the date, but she admitted that she pled guilty to the charge. She also admitted that on August 29, 1997, she pled guilty to a charge of crime against nature. However, Jocelyn again testified that she was positive that the defendant was the man who had stabbed her.
Kathy Wells, the defendant's friend and previous girlfriend, testified on his behalf. She testified that the defendant's birthday was March 11, that he was with her from approximately 5:00 p.m. on March 11, 1997 and all day March 12, 1997, and she was positive that he stayed at her home for approximately two weeks thereafter. Wells stated that although they would sometimes go to his house to feed his dog during the day, the defendant did not go home to spend the night. She explained that because the defendant did not have a car, she would pick him up and bring him home. Wells denied that the defendant ever borrowed her car in the early hours of the morning. She testified that her birthday was May 22, and that on May 22, 1997, she thought that her birthday fell during the middle of the week. She testified that the defendant was not with her on her birthday, but that he came to see her the weekend following her birthday and stayed with her through the following week, which included May 28, 1997.
In brief to this court the defendant assigns five errors for our review. In the first assignment, the defendant asserts the trial court erred in admitting numerous hearsay statements made by police officers, who were state witnesses at trial. Defendant argues that the admission of the statements was not harmless, and that the statements necessarily contributed to the verdict because the officers, who testified before the victims, testified about statements that were made to them by the victims and, therefore, gave greater credibility to the victims' testimony.
The State responds that one of the officers' testimony was subject to various exceptions *963 to the rule against the admissibility of hearsay. The State also argues that the statements made by the other two officers were cumulative because the declarants testified at the trial and were subject to extensive cross-examination, and that the officers were merely explaining the direction of their investigation.
In State v. Smith, 97-1075, pp. 6-7 (La. App. 5 Cir. 4/15/98), 710 So.2d 1187, 1190, this Court discussed hearsay as follows:
Hearsay is a statement made out of court offered as evidence in court to prove the truth of the matter asserted by the statement. La. C.E. art. 801. La. C.E. art. 802 provides that "[h]earsay is not admissible except as otherwise provided by this Code or other legislation." Hearsay is excluded because the value of the statement rests on the credibility of the out-of-court asserter who is not subject to cross-examination and other safeguards of reliability.
This Court has held that evidence is not hearsay and is thus admissible if it is introduced to show that the utterance occurred or that the conversation took place rather than to show the truth of the matter asserted.
Moreover, although a statement may constitute inadmissable hearsay, if the statement is merely cumulative or corroborative, the admission of such statement is harmless error. Citations omitted.
Turning to the defendant's first complaint, Officer Wiedenhaft testified that Jocelyn told him that she had gotten in a car with a white male with long hair, that he had cut her and that she had jumped out of his car to get away. The defendant's trial attorney objected just as the officer began to testify regarding the substance of what Jocelyn told him, and the trial judge overruled the objection explaining as follows: "I'm gonna allow it; she's going to testify."
LSA-C.E. art. 803 lists various exceptions to the general rule against the admission of hearsay statements, and provides in pertinent part:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
1-Present sense impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.

. . .
Officer Wiedenhaft's testimony was a present sense impression, as provided for in the above article. The victim testified that she was giving a statement to the police five minutes after she was stabbed. Officer Wiedenhaft testified that when he spoke to Jocelyn, she was really shaken up and her hand was quite bloody. Officer Wiedenhaft testified further that Jocelyn told him that she had just jumped from the defendant's car. The victim's statement was made immediately after the victim was attacked by the defendant, and, as such, the statement falls within the present sense impression exception to the general rule against admitting hearsay. LSA-C.E. art. 803(1); State v. Jones, 98-1055 (La.App. 5 Cir. 2/23/99), 729 So.2d 95, 1999 WL 89726.
Even assuming Officer Wiedenhaft's statement constituted impermissible hearsay, the admission of such statement is harmless error. State v. Winfrey, 97-427 (La.App. 5 Cir. 10/28/97), 703 So.2d 63, writ denied, 97-0264 (La.6/19/98), 719 So.2d 481. The appropriate inquiry is "whether the guilty verdict actually rendered in this trial was surely unattributable to the error." Id, 703 So.2d at 78. "Factors to be considered in making this determination include: (1) the importance of the witness's testimony; (2) the cumulative nature of the testimony; (3) the existence of corroborating or contradictory evidence regarding the major points of the testimony; (4) the extent of cross-examination permitted; and (5) the overall strength of the state's case." State v. *964 Balsar, 625 So.2d 664, 666 (La.App. 5 Cir. 1993), writ denied, 93-2799 (La.1/13/94), 631 So.2d 1164.
Initially, it should be noted that although this information was originally testified to during Officer Wiedenhaft's testimony, the victim herself later testified regarding the same information. Therefore, Officer Wiedenhaft's testimony was merely cumulative, and it has been held that if the statement at issue is merely cumulative or corroborative, the admission of such statement is harmless error. State v. Smith, supra. Moreover, both Officer Wiedenhaft and Jocelyn were available for cross-examination, and the defense was not curtailed in its cross-examination of this information. Finally, in light of Jocelyn's eyewitness testimony against the defendant, as discussed infra, the admission of the statement was harmless error, as the guilty verdict was surely unattributable to the error.
Defendant also complains of testimony given by Officer Rotherham, in which the officer related that on May 29, 1997, he was working with Officer Mitchell conducting field interviews with prostitutes that worked along Fourth Street. As the district attorney was asking the officer to relate what Jocelyn had told him, the defendant's trial attorney objected that the question called for hearsay. The district attorney argued that, "its part of the investigation... its (sic) gonna come out." The trial judge overruled the objection because Jocelyn was going to testify. Officer Rotherham testified that when shown the five photographs, Jocelyn immediately identified the defendant's photograph and told them that the defendant had picked her up, driven a few blocks away and then produced a knife. Officer Rotherham explained that the information Jocelyn provided was relayed to the supervisor of the task force, who at that time was located a little more than a mile away speaking to April.
Later during his testimony, Officer Rotherham also testified, over defense objection, regarding the substance of what April told him. The trial judge allowed the line of questioning to continue because April herself was going to testify. Officer Rotherham testified that he could not relate the specifics of what April had told the police because he was not the person who interviewed her. However, he knew that April had said that the defendant had taken her to Nine Mile Point Road and forced her to perform oral sex upon him by threatening her with a weapon.
The defendant also complains of portions of Officer O'Neil's testimony. Officer O'Neil testified that in May of 1997 he was working on an investigation with the task force which, up until that point, did not involve April. Officer O'Neil testified that he initially approached April and showed her a group of five photographs, whereupon April identified the defendant's photograph. When the district attorney asked the officer whether April told him why she selected the defendant's photograph, the defense attorney objected on the grounds that said question called for hearsay. The trial judge overruled the objection, explaining as follows: "[i]f she said, and she's going to testify, so I'll allow it." Officer O'Neil testified that April told him that when she was working as a prostitute on Fourth Street, the defendant picked her up and drove her to Nine Mile Point Road, where he held her at gunpoint and forced her to perform oral sex upon him.
Although it is true that Officer Rotherham testified regarding the substance of what Jocelyn told him, and regarding the substance of what April told other police officers, and Officer O'Neil testified regarding the substance of what April told him, we find that the admission of the officers' testimony constitutes harmless error. Initially, it should be noted that although Officers Rotherham and O'Neil testified before Jocelyn and April testified, the victims later testified regarding the same information. Therefore, Officer Rotherham's and Officer O'Neil's testimony was merely cumulative and/or corroborative, *965 and is therefore, harmless error under the jurisprudence enunciated in State v. Smith, supra. Moreover, Officer Rotherham, Officer O'Neil, April and Jocelyn were all available for cross-examination, and the defense was not curtailed in its cross-examination regarding this information. In fact, although the defendant claims that the cumulation of the officers' hearsay statements lent more credibility to the victims' subsequent testimony, the defense attorney seriously attacked each victim's credibility during cross-examination. The jury heard the victims admit that they were drug abusers and prostitutes previously. After initially denying any previous convictions, April admitted that she was previously convicted of theft, forgery and crime against nature. Jocelyn admitted that she had convictions for possession of a controlled dangerous substance and for crime against nature. Finally, in light of Jocelyn's and April's eyewitness testimony against the defendant, which constitutes direct evidence that the defendant committed the crimes for which he was convicted, the admission of the officers' statements was harmless error, as the guilty verdicts were surely unattributable to the error.
In the second assignment of error, the defendant contends the trial court erred when it denied the motion for post verdict judgment of acquittal because the evidence was insufficient to support his convictions for aggravated sexual battery and aggravated battery. Specifically, the defendant argues that the State failed to prove that he was the individual who committed the crimes against the victims. He argues that the two women were prostitutes and drug abusers, and that, therefore, their testimony is suspect and that they were not credible witnesses.
The defendant filed a motion for post conviction judgment of acquittal, which the trial judge denied as follows:
All right. This Court did listen to the testimony in this case, and I think part of the corroborating part of this case was that these two women identified Mr. Ditcharo at approximately the same time but at very different partsI think very different ends, maybe, of Fourth Street. I think that was corroborating. I think, perhaps, the jury locked in on that......
LSA-C.Cr.P. art. 821(B) provides as follows: "A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty." The appropriate standard of review for determining the sufficiency of the evidence was set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In Jackson v. Virginia, supra, the Supreme Court explained that when assessing the sufficiency of the evidence, the reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. See also; State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291; State v. Rosiere, 488 So.2d 965 (La.1986). As noted by this Court, "[t]he Jackson v. Virginia standard has been codified in Louisiana by C.Cr.P. art. 821." State v. Gabriel, 542 So.2d 528, 541 (La.App. 5 Cir.1989), writ denied, 558 So.2d 566 (La.1990).
Regarding circumstantial evidence, LSA-R.S. 15:438 provides as follows:
The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.
The Louisiana Supreme Court enunciated the distinction between direct and circumstantial evidence as follows:
The characterization of evidence as "direct" or "circumstantial" points to the kind of inference which is sought to be drawn from the evidence to the truth of the proposition for which it is offered. If the inference sought is merely that certain facts are true because a witness *966 reported his observation and the assumption that witnesses are worthy of belief, the evidence is direct. When, however, the evidence is offered also for some further proposition based upon some inference other than merely the inference from assertion to the truth of the fact asserted, then the evidence is circumstantial evidence of this further fact-to-be-inferred. McCormick, § 185 p. 435.
State v. Graham, 422 So.2d 123, 129-130 (La.1982), appeal dismissed, 461 U.S. 950, 103 S.Ct. 2419, 77 L.Ed.2d 1309 (1983).
With respect to the credibility of witnesses, the Louisiana Supreme Court has stated:
It is the role of the fact-finder to weigh the respective credibilities of witnesses, and this court will not second-guess the credibility determinations of the trier of fact beyond our sufficiency evaluations under the Jackson standard of review.
State ex rel Graffagnino v. King, 436 So.2d 559, 563 (La.1983). It is not the function of the appellate court to assess the credibility of witnesses or to reweigh the evidence. Rosiere, 488 So.2d at 968; State v. Sampson, 95-58, p. 7 (La.App. 5 Cir. 5/30/95), 656 So.2d 1085, 1088, writ denied, 95-1665 (La.11/27/95), 663 So.2d 730.
Additionally, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Alexander, 97-1199, p. 7 (La.App. 5 Cir. 9/29/98), 720 So.2d 82, 86, writ denied, 98-3109 (La.4/9/99), 740 So.2d 628; State v. Battle, 93-900, p. 4 (La.App. 5 Cir. 3/29/94), 635 So.2d 337, 340, writ denied, 94-1592 (La.10/28/94), 644 So.2d 649.
The defendant was convicted of one count of aggravated battery, in violation of LSA-R.S. 14:34, and one count of aggravated sexual battery, in violation of LSA-R.S. 14:43.4.[2] He argues to this Court that the State did not prove he was the person who committed the crimes.
The State offered direct evidence to prove that the defendant was the person responsible for committing the crimes against April and Jocelyn. Both women selected the defendant's photograph from a group of five photographs that were being randomly shown to prostitutes in the Fourth Street area. Both women again selected the defendant's photograph from a second photographic lineup. April testified unequivocally that the defendant was the man who held her at gunpoint and forced her to perform oral sex upon him. Jocelyn testified unequivocally that the defendant was the man who cut her with a knife. Their testimony alone would be sufficient to negate any reasonable probability of misidentification. State v. Alexander; supra; State v. Battle, supra. While it is true that both women admitted that they were previously prostitutes and drug abusers, and that they had convictions, the jury apparently believed their testimony despite the attacks made upon their credibility. Credibility determinations are for the jury, and it is not the function of the appellate court to assess the credibility of April and Jocelyn. State v. Rosiere, supra; State v. Sampson, supra.
Viewing the evidence in the light most favorable to the State, the State negated any reasonable probability of misidentification *967 and, therefore, carried its burden of proof. Therefore, the trial judge did not err by denying the defendant's motion for post-verdict judgment of acquittal.
In the third assignment, the defendant argues the trial court erred when it ruled that defendant was a third felony offender. By this assignment of error, the defendant claims that the State failed to prove that he is a third felony offender. Specifically, the defendant claims that the State failed to offer proof that the defendant was the person convicted on February 5, 1993 of simple burglary in the Seventeenth Judicial District Court for Lafourche Parish, case number 242995. The defendant acknowledges that the State offered an arrest register dated May 5, 1992, and that testimony verified that the fingerprints of the individual arrested on May 5, 1992 matched those of the defendant. However, the defendant claims that the State failed to link the May 5, 1992 arrest register with any documents purporting to demonstrate that he was ever convicted of the crime for which he was arrested on May 5, 1992.
The State responds that it did carry its burden of proof at the habitual offender hearing. Citing State v. Bell, 97-1134 (La. App. 5 Cir. 2/25/98), 709 So.2d 921, writ denied, 98-0792 (La.9/16/98), 721 So.2d 477, the State notes that this Court has rejected the argument that evidence in an habitual offender hearing is insufficient merely because the fingerprints are located on an arrest register card rather than a bill of information. The State notes that in State v. Simmons, 95-309 (La.App. 5 Cir. 10/18/95), 663 So.2d 790, a fingerprint expert testified that fingerprints taken in court matched those found on an arrest register for the predicate offense.
In the instant matter, the trial judge found that the defendant was a third felony offender and gave written reasons, which were read in court and provide in pertinent part:
. . .
In case number 242995 of the 17th Judicial District Court, Lafouche (sic) Parish, Michael Ditcharo was charged with violating La. R.S. 14:62, a felony under the law of Louisiana and that he pled guilty as charged on February 5, 1993. The defendant was sentenced to three years to the Department of Corrections which was suspended and he was placed on active probation. On January 4, 1996, defendant was revoked from active probation.
This file contained all of the appropriate waiver of rights forms and the finger prints of the defendant in this case matched the finger prints of the defendant, Michael Ditcharo, according to testimony by Captain Meril Boling, a court qualified expert in the field of finger print comparisons and analysis.

. . .
Initially, it is noted that the defendant did not file a written response to the bill of information prior to the multiple offender hearing, as required by LSA-R.S. 15:529.1(D)(1)(b). However, the defendant's trial attorney argued that there was no fingerprint evidence to demonstrate that the defendant was the individual convicted of the crime in Lafourche Parish.
In State v. Winfrey, supra, 703 So.2d at 80, this Court noted as follows:
To prove that a defendant is an habitual offender, the state need only establish by competent evidence that there is a prior felony conviction and that the defendant is the same person who was convicted of the prior felony. (Emphasis added).
In the present case, the defendant complains that the State did not prove that he was the individual who was convicted of the previous felony in Lafourche Parish. The State introduced into evidence the following pertinent exhibits:
State Exhibit no. 1-A fingerprint card dated May 22, 1998 bearing the defendant's *968 fingerprints. The fingerprint card reflects that said fingerprints were taken by Officer Boling.
State Exhibit no. 2-The first page is a copy of a Lafourche Parish "Report of Arrest" reflecting that "Michael James Ditcharo" was arrested on May 5, 1992 for one count of simple burglary, in violation of LSA-R.S. 14:62. The camp of Rudy Guidroz was allegedly burglarized. The second through the fourth pages are certified copies of the same fingerprint card reflecting that "Michael Ditcharo" was arrested on May 5, 1992 and fingerprinted on May 6, 1992 for simple burglary.
State Exhibit no. 3-The first document is a certified copy of a bill of information for Lafourche Parish case number 242995 reflecting that "Michael Ditcharo" was charged with the simple burglary of a camp belonging to Rudy Guidroz, in violation of LSA-R.S. 14:62. The crime was allegedly committed on April 30, 1992. The second document is a certified copy of the February 5, 1993 minute entry for "State of Louisiana vs. no. 242995 Michael Ditcharo." It states that on this date the defendant pled guilty as charged and that sentencing was set for April 8, 1993. The third document is a certified copy of the April 22, 1993 minute entry for "State of Louisiana vs. no. 242995 Michael Ditcharo." It states that on this date, the defendant was sentenced to serve three years at hard labor, the trial judge suspended the sentence, placed the defendant on supervised probation for five years and provided for various special conditions of probation. The fourth document is a certified copy of the January 4, 1996 minute entry for "State of Louisiana vs. no. 242995 Michael Ditcharo." It states that on this date, the defendant's probation was revoked and the previous sentence imposed was made executory.
State Exhibit no. 4-A certified copy of the February 5, 1993 transcript from Lafourche Parish case number 242995 reflecting that "Michael Ditcharo" was advised of his constitutional rights and that, thereafter, the trial judge accepted the defendant's guilty plea to one count of simple burglary. When requested to provide a factual basis for the guilty plea, the district attorney stated that the defendant committed simple burglary of a camp belonging to Rudy Guidroz, which was located in Lafourche Parish.
Officer Boling, accepted by the trial judge as an expert in the field of fingerprint identification, testified that the fingerprints located on State Exhibit number One, which he personally took from the defendant on May 22, 1998, matched the fingerprints found on State Exhibit number Two.
As noted by the State, this Court has held that testimony comparing a defendant's current fingerprints with fingerprints found on prior arrest records is sufficient to prove that the defendant was the person convicted of a prior felony. State v. Bell, supra; State v. Joseph, 96-187 (La.App. 5 Cir. 11/14/96), 685 So.2d 237, writ granted in part on other grounds, 96-2998 (La.5/9/97), 693 So.2d 782. The arrest report reflects that the defendant was arrested on May 5, 1992 and fingerprinted on May 6, 1992 for the simple burglary of a camp belonging to Rudy Guidroz. (State Exhibit no. 2). The bill of information alleges that in Lafourche Parish district court case number 242995, "Michael Ditcharo" was charged with the April 30, 1992 simple burglary of a camp belonging to Rudy Guidroz. (State Exhibit no. 4). The transcript reflects that on February 5, 1993, in Lafourche Parish district court case number 242995, "Michael Ditcharo" pled guilty to the simple burglary of a camp belonging to Rudy Guidroz. (State Exhibit no. 5). Officer Boling testified that the defendant's fingerprints in State Exhibit number One *969 matched those found in State Exhibit number Two.
Therefore, we find that the State linked the defendant's fingerprints that were attached to the May 5, 1992 arrest report with the documents demonstrating that on February 5, 1993, "Michael Ditcharo" was convicted of simple burglary of a camp belonging to Rudy Guidroz.
In the fourth assignment of error, the defendant argues the trial court erred when it imposed only one sentence upon Mr. Ditcharo although he was convicted of two charges. The defendant complains that it is impossible to determine whether he received his enhanced sentence of life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence, pursuant to one or both of his convictions. The defendant notes that he must receive a sentence for each of his convictions, and he requests that this court vacate his enhanced sentence and remand for re-sentencing.
The State responds that it is clear that the enhanced sentence applies to the defendant's conviction for aggravated oral sexual battery, as that is the underlying offense listed in the habitual offender bill of information. The State notes that it has no objection to a remand for sentencing on the defendant's remaining conviction of aggravated battery.
In State v. Sheridan, 98-205 (La.App. 5 Cir. 10/14/98), 721 So.2d 58, the defendant was convicted of two counts of armed robbery, in violation of LSA-R.S. 14:64. The defendant was sentenced to two consecutive sixty year terms of imprisonment at hard labor. The State filed an habitual offender bill of information and, following a hearing, the trial judge found the defendant to be a third felony offender and sentenced the defendant to serve life imprisonment. This Court noted that the trial judge had not vacated the defendant's original sentence, or sentences, and held that the case must, therefore, be remanded for re-sentencing. This Court also noted that defendant's enhanced sentence must also be vacated because "it is not clear to which (one or both) armed robbery conviction it applied." Id. Further, we noted that the defendant was convicted of two counts of armed robbery and that both convictions were listed in the habitual offender bill of information. Id. Therefore, this Court stated that "it cannot be determined from the record whether the trial court was sentencing defendant on both counts or on one count, and if on one count, on which count" and explained that "[t]his likewise was error as it is required that a defendant receive a determinate sentence for each offense upon which he is convicted." Id.
In the present case, following the conviction for aggravated battery and aggravated oral sexual battery, the State filed an habitual offender bill of information designating the defendant's conviction for aggravated oral sexual battery as the underlying felony conviction. Although the trial judge never specified which count the defendant was receiving an enhanced sentence on, reference to the habitual offender bill of information reflects that the defendant received an enhanced sentence for his conviction of aggravated oral sexual battery. This case is distinguishable from Sheridan because reference to the habitual offender bill of information reflects that the enhanced sentence was imposed for the defendant's conviction of aggravated oral sexual battery and, therefore, the defendant's enhanced sentence need not be vacated on this ground.
However, as noted by both the defendant and the State, the defendant has never been sentenced for his conviction of aggravated battery. The defendant urges that "[t]he trial court must impose a sentence for each separate count for which the defendant was convicted". The State requests that this Court remand the case for sentencing on this conviction. LSA-C.Cr.P. art. 879 requires that "[i]f a defendant who has been convicted of an offense *970 is sentenced to imprisonment, the court shall impose a determinate sentence". Accordingly, we remand the case for sentencing on the defendant's conviction of aggravated battery.
In the final assignment, the defendant argues that the trial court erred when it imposed an excessive sentence. The defendant complains that the trial judge imposed an excessive sentence and failed to comply with the provisions of LSA-C.Cr.P. art. 894.1. The defendant acknowledges that the appropriate sentencing provision, LSA-R.S. 15:529.1(A)(1)(b)(ii), mandates that he receive life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence, but he argues that the application of the principles pronounced in State v. Dorthey, 623 So.2d 1276 (La.1993), supports a downward deviation from the statutorily mandated sentence.
The State responds that the defendant has not demonstrated that in his case the statutorily mandated sentence would make no measurable contribution to the acceptable goals of punishment, or that the enhanced sentence amounts to nothing more than the purposeful imposition of pain and suffering and is grossly out of proportion to the severity of the crime. Therefore, the State argues that the defendant has not demonstrated that his sentence is excessive. The State argues that because the sentence was mandatory, the trial judge did not have to provide reasons when imposing said enhanced sentence.
The defendant's underlying conviction was for aggravated oral sexual battery, in violation of LSA-R.S. 14:43.4. LSA-R.S. 14:2(13) lists aggravated oral sexual battery as a crime of violence. Following the trial judge's finding that the defendant was a third felony offender, the defendant was subject to sentencing pursuant to LSA-R.S. 15:529.1(A)(1)(b)(ii), which provides as follows:
If the third felony or either of the two prior felonies is a felony defined as a crime of violence under R.S. 14:2(13) or as a violation of the Uniform Controlled Dangerous Substances Law punishable by imprisonment for more than five years or any other crime punishable by imprisonment for more than twelve years, the person shall be imprisoned for the remainder of his natural life, without benefit of parole, probation, or suspension of sentence.
The trial judge sentenced the defendant as follows:
... All right. The law, under 15:529.1, requires, on a third felony conviction, when any one of the three convictions is a crime of violence, this Court has no choice but to sentence Mr. Ditcharo to life imprisonment, without benefit of parole, probation or suspension of sentence. In this case, the third crime, the crime withcrimes with which he was convicted in this Court, 14:34 and 14:43.4 are both crimes of violence, as listed in 14:2 paragraph 13, and so this Court has no choice but to sentence youwhere's Mr. Ditcharosentence you, sir, to life imprisonment, without benefit of parole, probation or suspension of sentence....
The defendant's trial attorney generally objected at the time of sentencing to the enhanced sentence. On the same date, the defendant filed a motion to reconsider his sentence, arguing that the sentence was excessive, which was denied by the trial judge on November 20, 1998. The defendant's trial attorney generally objected to the trial judge's denial of the motion to reconsider his enhanced sentence.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is constitutionally excessive if it is grossly out of proportion to the seriousness of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. State v. Lassere, 95-1009 (La.App. 5 Cir. 10/1/96), 683 So.2d 812, writ denied, 96-2655 (La.4/18/97), 692 So.2d 445. A sentence is grossly disproportionate *971 if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. Id. The sentence imposed will not be set aside absent a showing of manifest abuse of the trial court's wide discretion to sentence within statutory limits. Id.
In State v. Johnson, 97-1906, pp. 5-9 (La.3/4/98), 709 So.2d 672, 675-677, the Louisiana Supreme Court addressed the issue of whether Dorthey permits a trial judge to deviate from the statutorily mandated sentences found in LSA-R.S. 15:529.1, and explained as follows:
In State v. Dorthey, supra, this Court held that a trial court must reduce a defendant's sentence to one not constitutionally excessive if the trial court finds that the sentence mandated by the Habitual Offender Law "makes no measurable contribution to acceptable goals of punishment", or is nothing more than "the purposeful imposition of pain and suffering" and is "grossly out of proportion to the severity of the crime." Id. at 1280-81. Finding a mandatory minimum sentence constitutionally excessive requires much more, though, than the mere utterance of the phrases above.
A sentencing judge must always start with the presumption that a mandatory minimum sentence under the Habitual Offender Law is constitutional. See State v. Dorthey, supra at 1281 (Marcus, J., concurring); State v. Young, supra, 94-1636 (La.App. 4th Cir.1995), 663 So.2d 525. A court may only depart from the minimum sentence if it finds that there is clear and convincing evidence in the particular case before it which would rebut this presumption of constitutionality.
A trial judge may not rely solely upon the non-violent nature of the instant crime or of past crimes as evidence which justifies rebutting the presumption of constitutionality. While the classification of a defendant's instant or prior offenses as non-violent should not be discounted, this factor has already been taken into account under the Habitual Offender Law for third and fourth offenders. LSA-R.S. 15:529.1 provides that persons adjudicated as third or fourth offenders may receive a longer sentence if their instant or prior offense is defined as a "crime of violence" under LSA-R.S. 14:2(13). Thus the Legislature, with its power to define crimes and punishments, has already made a distinction in sentences between those who commit crimes of violence and those who do not. Under the Habitual Offender Law those third and fourth offenders who have a history of violent crime get longer sentences, while those who do not are allowed lesser sentences. So while a defendant's record of non-violent offenses may play a role in a sentencing judge's determination that a minimum sentence is too long, it cannot be the only reason, or even the major reason, for declaring such a sentence excessive.
Instead, to rebut the presumption that the mandatory minimum sentence is constitutional, the defendant must clearly and convincingly show that:
[he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.

Young, 94-1636 at pp. 5-6, 663 So.2d at 528 (Plotkin, J., concurring).
When determining whether the defendant has met his burden of proof by rebutting the presumption that the mandatory minimum sentence is constitutional, the trial judge must also keep in mind the goals of the Habitual Offender Law. Clearly, the major reasons the Legislature passed the Habitual Offender Law were to deter and punish recidivism. *972 Under this statute the defendant with multiple felony convictions is treated as a recidivist who is to be punished for the instant crime in light of his continuing disregard for the laws of our state. He is subjected to a longer sentence because he continues to break the law. Given the Legislature's constitutional authority to enact statutes such as the Habitual Offender Law, it is not the role of the sentencing court to question the wisdom of the Legislature in requiring enhanced punishments for multiple offenders. Instead, the sentencing court is only allowed to determine whether the particular defendant before it has proven that the mandatory minimum sentence is so excessive in his case that it violates our constitution.
. . .
We emphasize to sentencing judges that departures downward from the minimum sentence under the Habitual Offender Law should occur only in rare situations. ... (Emphasis added).
In the present case, a review of the sentencing hearing reflects that the defendant did not offer any evidence demonstrating that he is exceptional to justify a downward departure from the statutorily mandated sentence of life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence. His motion for reconsideration of his enhanced sentence merely states that his enhanced sentence is excessive, and his brief to this court merely argues that his previous convictions were not violent crimes. Therefore, we find that the defendant did not rebut the presumption that the mandatory minimum sentence is constitutional, and that the trial judge, who would have had to have found clear and convincing evidence to justify a downward departure from the minimum sentence found in LSA-R.S. 15:529.1, did not err in sentencing the defendant to the statutorily mandated enhanced sentence of life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence.
Finally, regarding LSA-C.Cr.P. art. 894.1, we note that "[i]f there is an adequate factual basis for the sentence contained in the record, the trial court's failure to articulate every circumstance listed in Article 894.1 will not require a remand for re-sentencing." State v. Morris, 98-236, pp. 11-12 (La.App. 5 Cir. 9/16/98), 719 So.2d 1076, 1082. In the present case, the defendant's underlying offense was aggravated oral sexual battery, a crime of violence. The defendant forced April to perform oral sex upon him by holding a gun to her head. April testified that she was really frightened. The defendant also had prior convictions for possession of stolen things worth greater than five hundred dollars and simple burglary. It appears that there is an adequate factual basis for the sentence contained in the record, and, therefore, the trial court's failure to articulate reasons for the sentence pursuant to LSA-C.Cr.P. art. 894.1 does not require a remand for re-sentencing. Morris, supra.
However, as previously stated the defendant was not sentenced on the conviction of aggravated battery. Accordingly, we must remand the matter for sentencing on the aggravated battery conviction.
For the foregoing reasons, we affirm the trial court and remand the matter for sentencing on the aggravated battery conviction.
AFFIRMED AND REMANDED.
NOTES
[1] The enhanced sentence was imposed for the defendant's conviction of aggravated oral sexual battery, as discussed in Assignment of Error Number Four, infra.
[2] LSA-R.S. 14:34 provides in pertinent part: Aggravated battery is a battery committed with a dangerous weapon.

. . .
LSA-R.S. 14:43.4 provides in pertinent part:
A. Aggravated oral sexual battery is an oral sexual battery committed when the intentional touching of the genitals or anus of one person and the mouth or tongue of another is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
. . .
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
. . .