815 So.2d 275 (2002)
STATE of Louisiana
v.
Elton COWART.
No. 01-KA-1178.
Court of Appeal of Louisiana, Fifth Circuit.
March 26, 2002.
*278 Holli Herrle-Castillo, Louisiana Appellate Project, Marrero, LA, Counsel for Elton Cowart, Defendant-Appellant.
Paul D. Connick, Jr., District Attorney, 24th Judicial District Court, Parish of Jefferson, State of Louisiana, Terry M. Boudreaux, Churita Hansell, Assistant District AttorneysAppellate Counsel, Walter G. Amstutz, Assistant District AttorneyTrial Counsel, Gretna, LA, Counsel for State of Louisiana, Plaintiff-Appellee.
Panel composed of Judges EDWARD A. DUFRESNE, Jr., JAMES L. CANNELLA and SUSAN M. CHEHARDY.
CHEHARDY, Judge.
On October 7, 1999, the Jefferson Parish grand jury indicted defendant, Elton Cowart, on a charge of first degree murder, in violation of LSA-R.S. 14:30.[1] Defendant was arraigned and pled not guilty on October 13, 1999. He filed motions to suppress statements and identification, which were denied on June 19, 2000.
On November 27, 28, and 29, 2000, the case was tried before a 12-member jury, which unanimously found defendant guilty as charged. On December 1, 2000, the jurors were unable to reach a unanimous verdict during the penalty phase. On February 12, 2001, the trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. On February 15, 2001, defendant filed a motion for appeal, which was granted.

FACTS
At about 12:40 a.m. on July 31, 1999, Larrilynn Jones was in her apartment at 948 Beechgrove Boulevard in Jefferson Parish. She was sorting laundry when her puppy went to the window and started barking. Ms. Jones looked outside and saw three men walking down the sidewalk outside of her window. She recognized *279 one of the men, the defendant, as Elton, a man she had known for approximately four years.
She picked up her puppy, put him in the laundry basket with the dirty clothes, and went to the apartment complex's laundry room. After she put her clothes in the washing machine, she took her dog to a recreational area near the laundry room. While she was playing with her dog in the recreational area, she saw Darien Burse getting out of his van and walking toward Building 917. Ms. Jones was near Building 921 when she saw him. She decided to go over and speak with Mr. Burse because he had been a friend of hers before she moved to Beechgrove Apartments.
Before she could catch up with Burse, however, Ms. Jones had to retrieve her dog from the recreational area, which took a few minutes. She then went through the breezeway of Building 921 to find Burse. Before she got to the end of the breeze-way, she saw Burse being confronted by two men on the stairwell of Building 917. She also saw another man at the top of the stairs. She heard them tell Mr. Burse that they knew he had some money, that they knew that he had gotten a check on the first and the third of the month, and that they wanted him to give them the money.
She watched from a darkened corner of the breezeway as one of the men tried to go through Mr. Burse's pocket to get the money. Burse tried to walk up the stairs and tried to fight them off with his cane. Ms. Jones saw Burse hit the defendant on his shoulder, neck and head with the cane. Defendant then pulled out a gun and said, "Move out of the way, move out of the way, I'm about to get him." Defendant then shot Mr. Burse at least three times.
The three men ran away after the shooting. After he was shot, Burse tried to crawl up the stairs as he called for his girlfriend. Ms. Jones testified that the area of the breezeway in which the two men were confronting Burse was well-lit so she was able to get a good look at the men who robbed and shot Burse. Ms. Jones testified that she was standing about 12½ feet from where Mr. Burse was shot but also admitted that she wasn't very good with measurements.
About 20 or 30 minutes after the shooting, Ms. Jones saw defendant in another area of the apartment complex. Defendant, who was "fidgety," nervous and upset, asked Ms. Jones if she knew where his friend, Germaine, was. Ms. Jones asked defendant to go to the murder scene with her, but he refused. Ms. Jones admitted that she did not call the police about what she had seen because she was scared for herself and her two small children.
Deputy Wayne Williams of the Jefferson Parish Sheriff's Office, was called to the scene of a homicide at 917 Beechgrove Boulevard in Westwego. When he arrived on the scene, he observed a black male lying face down in the stairwell with blood circling the upper part of his body. He checked the victim's condition and called for an ambulance, which arrived very quickly.
Deputy Williams secured the scene and canvassed the area for any witnesses. He did find a gun at the scene. Further, while several people heard gunshots, no one else that he spoke to in the apartment complex had seen anything.
On July 31, 1999, Deputy Ralph Sacks also investigated the homicide at the Beechgrove Apartments. When he arrived at the scene, he oversaw the collection of evidence. The sheriff's office retrieved a holstered handgun, the victim's cane, the victim's back brace, the victim's baseball cap, a cigar, a cigarette lighter, keys, a pen, a bag, a bullet and several spent *280 casings. All of the evidence collected was submitted to the lab for DNA testing and blood typing; however, none of the evidence linked defendant to the homicide.
Deputy Sacks also interviewed Sandra Stiles and Ryan Stevenson, who were at 933 Beechgrove Boulevard, Apartment F that evening. Sandra Stiles heard gunshots shortly after midnight, went to the window, looked outside and saw two men running. One of them fell down, but got back up. Ms. Stiles could not identify their faces. She estimated their heights at 5 feet, 4 inches and didn't know how much they weighed. Both of them were wearing white T-shirts and one was wearing black jeans.
She admitted that she couldn't see Building 917 from her apartment because Building 921 was directly in between the two. Her building was about a block away from Building 921. Further, Ms. Stiles admitted under cross-examination at trial that she could have been mistaken about the perpetrators' height and "everything else" because of the distance she observed the perpetrators from the window.
Peter Manning, who lived with his mother at 917 Beechgrove Boulevard, Apartment L, did not hear anything on the night of the murder because his television was very loud and his dogs were barking. That night, however, he went outside the apartment and saw Burse, laying on the stairway. He recognized Burse because he often visited Michelle Young, a woman at the complex. Manning testified that Mr. Burse always walked with a cane and carried a black bag with him but that the black bag was not there when he saw Mr. Burse lying on the ground. Manning he did not see who committed the crime, nor did he see anyone running from the scene. He did find bullet holes in his apartment walls and bullets laying on the ground in his apartment after the shooting that weren't there before.
That night, however, Deputy Sacks, the lead investigator from Homicide Division of the Jefferson Parish Sheriffs Office, spoke with Ms. Jones who told him that she saw Elton, a man who had a girlfriend that lived at Beechgrove, around the crime scene. She described Elton as 6 feet, 3 inches, 180 or 190 pounds with a teardrop tattoo under his eye, and two gold teeth on the sides of his mouth. Ms. Jones did not tell initially tell the police that she had witnessed the crime because she was scared.
After speaking with Ms. Jones, Deputy Sacks located defendant on August 2, 2002 and asked defendant to accompany him to the detective bureau. Sacks reviewed a waiver of rights form with defendant, and defendant signed the form indicating he understood his rights and wished to give a statement.[2] The defendant's transcribed statement was read to the jury.[3]
*281 After the interview, Deputy Sacks brought defendant back to Tashia Harper's apartment, which he searched with Ms. Harper's consent.[4] He did not find any contraband.
Deputy Sacks then attempted to corroborate defendant's statement. He spoke to defendant's aunt and uncle who could not corroborate defendant's claim of being at their house at the time of the shooting. Deputy Sacks also spoke to William Shears and Germaine Gumps who were unable to corroborate defendant's claim that he was not in the Beechgrove area from 12:00 p.m. Friday until 12:00 p.m. Sunday.
When Deputy Sacks interviewed Shears, he stated that he picked up defendant and Germaine Gumps on August Avenue on the night that Burse was murdered then went to Beechgrove to drop off Gumps. Shears told Deputy Sacks that when they dropped off Gumps, the police were already there investigating Burse's murder. Shears was unable to tell Deputy Sacks what time he picked up or dropped off defendant. Further, although defendant had told Deputy Sacks that they played pool in Bridge City, Shears said they had played pool at the Sportsman Palace on Jefferson Highway. Finally, defendant did not mention being with Gumps. Although Deputy Sacks could not corroborate defendant's statement, he didn't arrest defendant at that time because there wasn't enough evidence to implicate him at that point.
On August 5, 1999, he interviewed Ms. Jones again because he had learned from her brother that she had witnessed the homicide. She was terrified during the interview and stated that she didn't give him all the information initially because she feared that she and her children would be killed in retaliation for talking to the police.
Ms. Jones then met with Deputy Sacks at the Detective Bureau. She gave a statement, in which she described all three men as wearing black shirts, blue jeans and black tennis shoes. She stated that the defendant was tall and had three teardrops under his eye but that the other two men were of average height.
Ms. Jones also looked at photographic lineups and identified defendant, who she had known for four years, as the man who shot Burse. Ms. Jones stated that she was certain of that identification, and that the police officers did not suggest whom she should pick out.
On August 6, 1999, Deputy Sacks conducted surveillance of the Beechgrove area and saw defendant speaking to a man who matched the description given by Ms. Jones. He stopped the man, who said his name was Moses Beverly. Deputy Sacks compiled a photographic lineup and showed it to Ms. Jones who identified Beverly, who she did not know prior to the evening of the murder, as the man who had gone through Mr. Burse's pockets before the shooting. Although she looked through several more lineups, she couldn't identify the third man.
On August 10, 1999, Deputy Sacks went back with a search warrant and searched Tashia Harper's apartment, but again found nothing. On August 11, 1999, defendant was arrested.
*282 At trial, Ms. Jones testified that she was 100 percent sure that defendant was the man who shot Burse, and that Beverly was the man who searched Burse's pockets. At trial, Ms. Jones also admitted that she had been convicted of theft.
Dr. Susan Garcia, an expert in forensic pathology, performed the autopsy of the victim. The decedent had three identifiable entrance wounds and two identifiable exit wounds on his body. Dr. Garcia testified that the wound on the decedent's left hand could be considered a defensive wound but the only lethal wound was the one on the left upper back. All of the wounds were inflicted from a range greater than 12 to 18 inches.
At trial, the State and the defense entered into the following stipulations: If the state had proceeded with DNA testimony, the state would have called Gina Pineda of Reliagene Technologies who would have testified that the only blood found on the cane belonged to Mr. Burse. If Sergeant Charlie Durel had been called to testify, he would have stated that the three cartridge cases, the cane, the lighter and the pen were examined and the fingerprints obtained were unreadable. The defense sent the three cartridge casings to the Tarrant County Medical Examiner's office in Dallas, Texas, and the fingerprint expert there would have testified that the latent prints on the shell casings were unreadable. If Christine Kogos of the Jefferson Parish Sheriff's Office had been called to testify, she would have stated that the items of clothing, etc. introduced into evidence had no serological interest. Further, if Captain Louise Walzer had been called to testify, she would have stated that a comparison of the five spent cartridge cases in specimens 1, 2 and 3 showed they had been fired from the same weapon, and that the comparison of the copper jacket and projectiles in specimens 20 and 30 were fired from the same weapon.

DISCUSSION
In his brief, defendant raises issues regarding sufficiency of the evidence and erroneous admission of evidence. When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, such as the erroneous admission of evidence, the reviewing court should first determine the sufficiency of the evidence by considering all of the evidence, including evidence the trial court may have erroneously admitted. State v. Hearold, 603 So.2d 731, 734 (La.1992); State v. Mayeux, 94-105 (La.App. 5 Cir. 6/28/94), 639 So.2d 828, 834.
If the appellate court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. If the appellate court finds, however, that the totality of the evidence was sufficient to support the defendant's conviction, it must then determine whether the trial court erred in admitting the questioned evidence and, if so, whether the trial court's error requires a reversal of the conviction or was harmless. State v. Alexis, 98-1145 (La.App. 5 Cir. 6/1/99), 738 So.2d 57, 64, writ denied, 99-1937 (La.10/13/00), 770 So.2d 339.
Defendant argues that the evidence was legally insufficient to convict him of first degree murder. He contends that there was no physical evidence linking him to the crime and that the State failed to prove that he was the perpetrator of the crime. Defendant claims that the testimony of Ms. Jones, the only eyewitness, was not credible.
In reviewing the sufficiency of the evidence, due process requires the reviewing court to determine "whether, after viewing the evidence in the light most *283 favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under Jackson, a review of a criminal conviction record for sufficiency of evidence does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. A reviewing court is required to consider the whole record, and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. The actual trier of fact is presumed to have acted rationally until it appears otherwise. State v. Mussall, 523 So.2d 1305 (La.1988).
In the present case, the defendant was indicted for first degree murder, because the victim was killed during the commission or attempted commission of an armed robbery. The statutes relevant to this case are LSA-R.S. 14:30 A(1), LSA R.S. 14:64, and LSA-R.S. 14:27:
LSA-R.S. 14:30 A(1) provides as follows:
A. First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... armed robbery.
LSA-R.S. 14:64 defines armed robbery as the following:
A. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
LSA-R.S. 14:27 defines attempt as follows:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.
C. An attempt is a separate but lesser grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt.
When the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. State v. Smith, 430 So.2d 31, 45 (La.1983); State v. Brady, 414 So.2d 364, 365 (La.1982); State v. Long, 408 So.2d 1221, 1227 (La. 1982). However, positive identification by only one witness is sufficient to support a conviction. See State v. Mussall, 523 So.2d 1305, 1311 (La.1988).
A significant part of the State's case was the testimony of Larrilynn Jones. Ms. Jones testified that, in the early morning hours of July 31, 1999, she saw Mr. Burse, a man that she knew, get out of his van and walk toward Building 917 of her apartment complex. She wanted to talk to him so she followed him. As she got to the end of the corridor of Building 921, which was across from Building 917, she *284 observed Burse being confronted by three men on the stairwell.
The men demanded money from Mr. Burse, and when he refused, one man started going through Burse's pockets. As Burse started walking away from the man up the stairs, the defendant pulled out a gun, said, "Move out of the way, I'm about to get him," and then shot Mr. Burse. She looked at photographic lineups and quickly identified defendant. Ms. Jones testified that she was 100 percent sure that the defendant, a man that she had known for four years, was the man who shot Mr. Burse.
Defendant argues that the State has not presented sufficient evidence of his guilt because it has not presented physical evidence that links him to this crime. Specifically, the blood found on the victim's cane that the victim allegedly used to hit defendant in the face tested negative for defendant's blood. Further, fingerprint evidence from the casings and shells did not match defendant, and no other evidence had any serological value. Finally, the police conducted two searches of defendant's girlfriend's apartment but did not retrieve the murder weapon, bullets, or clothing matching the description of that worn by the suspects.
Defendant is correct in that the only evidence against him is the eyewitness' testimony of Ms. Jones who admitted she initially lied to the police. Despite the lack of physical evidence linking defendant to the crime, Ms. Jones testified that she witnessed defendant shoot Burse after defendant and his co-perpetrators robbed or attempted to rob Burse. As was stated previously, positive identification by only one witness is sufficient to support a conviction. Mussall, supra. Further, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the court, is sufficient to support a conviction. State v. Myers, 98-899 (La.App. 5 Cir. 5/19/99), 737 So.2d 255.
Defendant also attacks inconsistencies in Ms. Jones' testimony and raises issues regarding her credibility. In particular, the defendant argues that: (1) the jury was unreasonable for relying on her testimony because she was a convicted felon and she had received psychiatric care for suicidal thoughts and depression; (2) she gave a statement to the police which she later admitted was not true, she admitted that she did not tell the police initially about witnessing the murder and where she was located at the time of the murder; (3) she perjured herself during motion hearings, testifying that she always told police the truth and then at trial admitting that she had lied initially; (4) her description of the clothing worn by the perpetrator failed to match that of two other witnesses who observed the suspects fleeing; (5) the physical descriptions of the suspects seen fleeing the scene varied greatly from the physical description of the defendant, who is heavier and taller than the description given; (6) there was a discrepancy regarding how far Ms. Jones was standing from the crime scene; (7) Ms. Jones initially claimed that the light upstairs where the third unknown perpetrator was standing was on, but the light by the murderers was off, and then changed her story and said that the area where the murder occurred was well-lit, but the light where she was standing was off; (8) Ms. Jones claimed Burse hit the defendant in the face with a cane, yet defendant had no marks on his face when Deputy Sacks met with him two days after the crime; (9) Ms. Jones claimed that defendant and the co-perpetrators were yelling at Burse, yet Mr. Manning, who lived in the apartment close to where the murder occurred, did not hear any yelling; and (10) Ms. Jones *285 initially claimed to have heard six shots, but then changed her story and said she only heard three shots.
At trial, Ms. Jones stated that she was scared for herself and her two small children, which is a rational explanation for not immediately telling the police that she had witnessed the murder. Further, it is clear from the record that Ms. Jones did not perjure herself when she stated that she was truthful with the police. She explained that she misunderstood defense counsel's reference to her statement. She thought that he was referring to her second statement and not the first statement when he asked her whether she had told Deputy Sacks the truth about the murder.
Although Ms. Jones description of the perpetrators' clothing differed from Ms. Stiles' description, the question of the credibility of the witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. The credibility of the witnesses will not be reweighed on appeal. State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056. Additionally, Ms. Stiles admitted at trial that she could have been mistaken about the perpetrators' height and "everything else" because the perpetrators were far away when she saw them.
Defendant contends that there was a discrepancy regarding how far Ms. Jones was standing from the crime scene at the time of the shooting. However, Ms. Jones admitted she was not good with measurements. Defendant argues that he had no marks on his face when Deputy Sacks met with him two days after the shooting, even though Ms. Jones testified that the victim hit defendant in the face with his cane. The evidence established that Burse, who was disabled and walked with a cane, was attempting to climb stairs when he was confronted by the perpetrators and shot. It is reasonable to infer that Burse may have had difficulty swinging the cane at defendant from that angle. Although Mr. Burse may have hit defendant, it is reasonable to infer that he may not have hit him hard enough to cause an injury.
Defendant contends that Mr. Manning did not hear voices other than Burse's at the time of the shooting; however, Manning stated that he did not hear anything because his television was very loud and his dog was barking at the time. Further, Ms. Jones may have changed her testimony regarding the number of shots she heard from six to three, but she was clear throughout the record that she was standing in an unlit portion of the breezeway looking into a well-lit potion of the breezeway during the confrontation. With respect to Ms. Jones' conviction for theft and psychiatric treatment, the jury apparently still believed Ms. Jones' testimony despite those issues, which is well within its discretion.
Defendant also argues that defendant's actions were not consistent with having committed a murder. Ms. Jones stated that she saw defendant about 20 to 30 minutes after the murder and he spoke with her. He did not flee the scene, as one would expect of someone who had just committed a murder. Additionally, he voluntarily went to the police station to give a statement, knowing that the police had previously gone to his girlfriend's house to look for him. Defendant voluntarily consented to a search. He claims that a suspect not investigated, an unknown black male in a white T-shirt who was observed immediately after the murder attempting to flag down cars on the Westbank Expressway, could have committed the murder.
*286 Although defendant did not flee the scene and voluntarily went to the police station, gave a statement, and consented to a search, the jury obviously rejected those actions as a basis for finding him not guilty. Defendant claims that there was another possible suspect who was seen on the Westbank Expressway; however, there was no evidence introduced to support that contention. In fact, when defense counsel asked Deputy Williams whether he was aware that a black male was seen flagging down cars on Highway 90, Deputy Williams responded that he was not.
Finally, defendant also argues that he took a polygraph exam and passed it, and Moses Beverly took one and failed it, and that the trial court would not allow that evidence at trial which prejudiced him. The Louisiana Supreme Court has long adhered to the view that lie detector or polygraph test results are inadmissible for any purpose at the trial of guilt or innocence in criminal cases.
The supreme court has made it clear that the rule excluding polygraph evidence "also operates to prevent any reference during trial to the fact that a witness has taken a polygraph examination with respect to the subject matter of his testimony." State v. Cosey, 97-2020 (La.11/28/00), 779 So.2d 675, 685-686, cert. denied, 533 U.S. 907, 121 S.Ct. 2252, 150 L.Ed.2d 239 (2001), citing State v. Hocum, 456 So.2d 602, 604 (La.1984); State v. Tonubbee, 420 So.2d 126, 132 (La.1982), cert. denied, 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983); State v. Davis, 407 So.2d 702, 706 (La.1981); State v. Catanese, 368 So.2d 975, 981 (La.1979). Such evidence is prohibited because it "invites a probable inference by the jury that the witness passed the polygraph examination and therefore is testifying truthfully." Hocum, 456 So.2d at 604-605. Therefore, the trial court correctly ruled that no evidence of the polygraph results was admissible at trial.
We find it obvious from the verdict rendered that, despite inconsistencies and/or discrepancies in Ms. Jones' testimony, the jury believed all or certain aspects of her testimony that linked the defendant to the incident. Moreover, the jury apparently rejected defendant's theory of the case of mistaken identity. Finally, we find that the record as a whole, when viewed in a light most favorable to the state, was sufficient to establish that defendant was the individual who murdered Darian Burse.
In his second assignment of error, defendant argues that the trial court erred in denying his motion to suppress the identification. He claims that it was impossible to determine whether the photographic lineup was suggestive, because the case file, including the photographic lineup, was stolen from Deputy Sacks' police unit, and because no photographs or duplications of photographs were presented to the court to make a determination of whether there was anything suggestive in the photographic lineup. Defendant argues that he was prejudiced by his inability to dispute the suggestiveness of the missing lineup and, therefore, the photographic lineup should have been suppressed. The State responds that it is of no consequence that the photographs were not available at trial, because the eyewitness, Ms. Jones, testified that she had known defendant for four years, lived in the same apartment complex as the victim, witnessed the murder and positively identified defendant shortly after the murder.
A defendant who seeks to suppress an identification must prove both that the identification itself was suggestive and that there was a likelihood of misidentification as a result of the identification *287 procedure. State v. Prudholm, 446 So.2d 729, 738 (La.1984); State v. Payne, 00-1171 (La.App. 5 Cir. 12/13/00), 777 So.2d 555, 558-559, writ denied, 01-118 (La.11/21/01), 802 So.2d 626. Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).
A photographic lineup is considered suggestive if the photographs display the defendant in such a manner that the witness's attention is unduly focused on the defendant. A lineup is also suggestive if there is not a sufficient resemblance of characteristics and features of the persons in the lineup. State v. Biglane, 99-111 (La.App. 5 Cir. 5/19/99), 738 So.2d 630, 634. Even if the identification could be considered suggestive, it is the likelihood of misidentification which violates due process, not merely the suggestive identification procedure. State v. Thibodeaux, 98-1673 (La.9/8/99), 750 So.2d 916, 932, cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000).
In Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the United States Supreme Court set forth five factors to consider in determining if an identification is reliable: 1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of the prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and, 5) the time between the crime and the confrontation. In evaluating the defendant's argument, the reviewing court may consider all pertinent evidence adduced at the trial, as well as at the hearing on the motion to suppress the identification. State v. Clennon, 98-1370 (La.App. 5 Cir. 6/30/99), 738 So.2d 161, 164. A trial court's determination of the admissibility of an identification should be accorded great weight and will not be disturbed on appeal unless the evidence reveals an abuse of discretion. Id.
In the instant case, Deputy Sacks testified at the suppression hearing that the photographic lineup was not available for viewing since it was stolen from his vehicle. Therefore, we could not review the photographic lineup firsthand for suggestivity. The record, however, reflects the following information. Deputy Sacks showed Ms. Jones an array of six photographs and asked her if she recognized anyone. Ms. Jones positively identified defendant. Ms. Jones testified that Deputy Sacks did not tell her which man to identify. Deputy Sacks testified that, in his career, he had compiled hundreds of photographic lineups, and that he always used the same standard of care in trying to get people who looked similar. He stated that he was satisfied that the six photographs he chose in this case looked similar. We cannot say that there is any indication that the lineup was suggestive.
Further, even if the identification was suggestive, it is the likelihood of misidentification which violates due process, not merely the suggestive identification procedure. Ms. Jones testified that she had known defendant for four years and that she saw him shoot Burse. She was able to get a good look at the men who robbed and shot Burse. She described the defendant as being 6 feet, 3 inches, 180 or 190 pounds with a teardrop tattoo under his eye and two gold teeth on the side of his mouth. Ms. Jones testified that she was 100 percent sure that defendant was the man who shot Mr. Burse. Furthermore, when confronted with the photographic lineup two days after the homicide, she did not hesitate in identifying defendant as the perpetrator. In applying the Manson factors *288 to the facts of the instant case, we do not find any substantial likelihood of misidentification.
In his third assignment of error, defendant argues that the trial court erred in allowing Deputy Sacks to testify to inadmissible hearsay. He contends that the trial court should not have allowed Deputy Sacks to state that defendant's aunt and uncle and William Shears, Germaine Gumps and Tiffany Harper could not corroborate defendant's alibi. The State responds that a police officer, in explaining his own actions in his investigation, may refer to statements made to him by other persons involved in the case.
In State v. Dyer, 00-1866 (La.App. 5 Cir. 4/25/01), 794 So.2d 1, this Court set forth the following law regarding hearsay:
Hearsay is an oral or written assertion, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. arts. 801(A)(1) and 801(C). Hearsay evidence is not admissible except as otherwise provided by the Code of Evidence or other legislation. La. C.E. art. 802; State v. Williams, 98-1006 (La. App. 5 Cir.3/30/99), 735 So.2d 62, 75. A witness is generally competent to testify that a statement was made to him so long as no attempt is made to vouch for the credibility of its contents. State v. Watson, 449 So.2d 1321, 1328 (La.1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985); State v. Williams, supra.

A police officer, in explaining his own actions, may refer to statements made to him by other persons involved in the case. Such statements are admitted not to prove the truth of the assertion, but to explain the sequence of events leading to the arrest of the defendant from the viewpoint of the officer. State v. Watson, supra at 1328; State v. Williams, supra.

State v. Dyer, 794 So.2d at 12.
In addition, the Louisiana Supreme Court, in State v. Broadway, 96-2659 (La.10/19/99), 753 So.2d 801, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000), stated:
Information about the course of a police investigation is not relevant to any essential elements of the charged crime, but such information may be useful to the prosecutor in "drawing the full picture" for the jury. However, the fact that an officer acted on information obtained during the investigation may not be used as an indirect method of bringing before the jury the substance of the out-of-court assertions of the defendant's guilt that would otherwise be barred by the hearsay rule. State v. Wille, [96-2659 La. 9] 559 So.2d 1321, 1331 (La.1990); State v. Hearold, 603 So.2d 731, 737 (La.1992). As this Court emphasized in Hearold, 603 So.2d at 737.
Absent some unique circumstances in which the explanation of purpose is probative evidence of a contested fact, such hearsay evidence should not be admitted under an "explanation" exception. The probative value of the mere fact that an out-of-court declaration was made is generally outweighed greatly by the likelihood that the jury will consider the statement for the truth of the matter asserted.
State v. Broadway, 753 So.2d at 809.
In State v. Smith, 97-1075 (La.App. 5 Cir. 4/15/98), 710 So.2d 1187, cited by the State in its brief to support its position that the deputy's statements were admissible, defendant complained that the trial judge erred in permitting the State to elicit impermissible hearsay testimony *289 from Detective Gurtner regarding gang membership. This Court found that the detective did not testify regarding the substance of anything that another person told him, but rather, he testified to the results of his investigation. As such, this Court held that the detective's testimony was not hearsay and thus the trial court did not err in admitting it.[5]State v. Smith, 710 So.2d at 1190.
Similarly, in Dyer, supra, defendant contended that the trial court erred in allowing the state to present testimony from Detective Brunet that was inadmissible hearsay. Defendant argued that the trial court improperly allowed Detective Brunet to testify that defendant became a suspect in the armed robbery after Troy Slater implicated a man named "Black," who was caught with the robbery victim's stolen car. When the defense objected at trial on the basis of hearsay, the State argued that the testimony was not being offered for the truth of the words spoken because Mr. Slater was going to testify later to the substance of the statement. The trial judge overruled the objection. This Court held that Detective Brunet's testimony was not hearsay, as it was offered to explain the sequence of events which led to defendant's arrest, not to prove the truth of the assertion that defendant was an accomplice in the armed robbery. State v. Dyer, 794 So.2d at 12.
However, in Broadway, supra, defendant contended that the prosecutor presented hearsay testimony from two police officers that Kevan Brumfield implicated defendant as one of the principals in the murder. Brumfield did not testify at trial. The supreme court concluded that the statements were hearsay, and that the presentation of such constituted significant error. The supreme court held, after a thorough examination of all of the evidence, that the error regarding the hearsay was harmless beyond a reasonable doubt. State v. Broadway, 753 So.2d at 809-810, 818.
Our review of the record indicates that the statements made by Deputy Sacks were admissible, because the statements were not admitted to prove the truth of the assertion, but were necessary to explain the sequence of investigative events that lead to the defendant's arrest. Deputy Sacks explained at trial that Ms. Jones told him she witnessed defendant shoot Burse. When Deputy Sacks questioned defendant about the shooting, defendant stated that he was at his aunt and uncle's house at the time of the shooting, and that he had spent time with "William" during the pertinent time period. Deputy Sacks was merely telling the jury that Ms. Jones' eyewitness testimony, coupled with the deputy's inability to confirm defendant's alibi, led the deputy to arrest defendant for Burse's homicide.
However, even assuming that Deputy Sacks' statements were introduced to prove the truth of the matter spoken and, thus, constituted impermissible hearsay, the admission of such statements is subject to the harmless error analysis. State v. Ditcharo, 98-1374 (La.App. 5 Cir. 7/27/99), 739 So.2d 957, writ denied, 99-2551 (La.2/18/00), 754 So.2d 964, citing State v. Winfrey, 97-427 (La.App. 5 Cir. 10/28/97), 703 So.2d 63, writ denied, 97-0264 (La.6/19/98), 719 So.2d 481.
The appropriate inquiry is then "`whether the guilty verdict actually rendered in this trial was surely unattributable to the error.'" State v. Winfrey, 703 So.2d at 78 (citations omitted). "Factors *290 to be considered in making this determination include: (1) the importance of the witness' testimony; (2) the cumulative nature of the testimony; (3) the existence of corroborating or contradictory evidence regarding the major points of the testimony; (4) the extent of cross-examination permitted; and (5) the overall strength of the state's case." State v. Ditcharo, 739 So.2d at 963-964, citing State v. Balsar, 625 So.2d 664, 666 (La.App. 5 Cir.1993), cert. denied, 93-2799 (La.1/13/94), 631 So.2d 1164.
In the instant case, although Deputy Sacks' testimony was not cumulative, the defense was allowed full cross-examination of Sacks on this information. Further, we find that, in light of Ms. Jones' eyewitness testimony against the defendant, the admission of Sacks' statement was harmless error, if any, as the guilty verdict was surely unattributable to the error.
In defendant's fourth assignment of error, he argues that the trial court erred in failing to allow him to withdraw his August 2, 1999 alibi statement. The State responds that defendant's statement was not used as an alibi defense nor did the State make reference to defendant's attempt to withdraw his alibi defense. The State further contends that, if this Court finds error in the trial court's ruling, then the error was harmless given the testimony of the eyewitness, Ms. Jones, and the fact that none of the witnesses called by the defense could corroborate defendant's statement.
On June 19, 2000, in open court, defendant gave oral notice of his intent to offer an alibi defense. He stated that his alibi defense was based on his August 2, 1999 statement, and that the statement constituted his written notice of alibi. The court apparently accepted this argument.
On November 29, 2000, however, defendant filed a "Motion to Exclude Statements Made in Connection with Intent [sic] Rely Upon Alibi." On that same date, defendant gave oral notice to the court of his intent to withdraw his alibi defense and moved to exclude his August 2, 1999 statement. The trial court ruled that it would allow the use of the statement because the statement was free and voluntary when given, and, moreover, at the time the statement was made, there was never any manifested intent to offer an alibi.[6]
*291 LSA-C.Cr.P. art. 727 provides as follows:
A. Upon written demand of the district attorney stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten days, or at such different time as the court may direct, upon the district attorney a written notice of his intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi.
B. Within ten days thereafter, but in no event less than ten days before trial, unless the court otherwise directs, the district attorney shall serve upon the defendant or his attorney a written notice stating the names and addresses of the witnesses upon whom the state intends to rely to establish the defendant's presence at the scene of the alleged offense and any other witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses.
C. If prior to or during trial, a party learns of an additional witness whose identity, if known, should have been included in the information furnished under Subsection A or B, the party shall promptly notify the other party or his attorney of the existence and identity of such additional witness.
D. Upon the failure of either party to comply with the requirements of this rule, the court may exclude the testimony of any undisclosed witness offered by such party as to the defendant's absence from or presence at, the scene of the alleged offense. This rule shall not limit the right of the defendant to testify in his own behalf.
E. For good cause shown, the court may grant an exception to any of the requirements of Subsections A through D of this Section.
F. Evidence of an intention to rely upon an alibi defense, later withdrawn, or of statements made in connection with such intention, is not admissible in any civil or criminal proceeding against the person who gave notice of the intention.
In this case, defendant's statement was used during Deputy Sacks' testimony when the State asked Deputy Sacks whether he was able to corroborate defendant's statement. Although defendant strenuously argues that his statement constituted notice of intent of alibi, we do not find that defendant intended his statement to be a notice of intent of alibi statement at the time it was made. Further, at trial, the State did not make reference to defendant's prior asserted intention to use an alibi defense and the defendant did not use the statement as an alibi defense. We find that the trial court did not err in allowing the state to use defendant's August 2, 1999 statement at trial.
Finally, appellant requests, pursuant to La.C.Cr.P. art. 920, a review of the record for errors patent. Our review reveals one error patent requiring remand in this case. The trial transcript indicates that, although the trial judge properly informed defendant that he had a two-year time period in which to seek post-conviction relief, he failed to indicate when that period commenced. Further, the commitment/minute entry reflects that the defendant was properly informed of the date that the post-conviction relief period commenced. Where there is a discrepancy between the transcript and the minute entry, the transcript will prevail. State v. Lynch, 441 So.2d 732, 734 (La.1983).
*292 La.C.Cr.P. art. 930.8 provides that a court shall not consider an application for post-conviction relief, including applications which seek an out-of-time appeal, if the application is filed more than two years after the judgment of the conviction and sentence has become final. Therefore, we remand to the district court with instructions to inform the defendant of the provisions of La.C.Cr.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof that defendant received the notice in the record of the proceedings. State v. George, 99-887 (La.App. 5 Cir. 1/4/00), 751 So.2d 973, 975.
In conclusion, we affirm the defendant's first-degree murder conviction and life sentence. We remand for appropriate La.C.Cr.P. art. 930.8 notice to the defendant.
AFFIRMED, REMANDED.
NOTES
[1] Moses Beverly was also charged in the bill of indictment with first degree murder of Darien Burse; however, this appeal only pertains to Elton Cowart.
[2] Sacks was unable to produce the defendant's signed waiver of rights form at trial because his unit had been burglarized, and the case file had been stolen.
[3] In the statement taken on August 2, 1999, defendant indicated that, at the time of the shooting, he was at home at 6141 August Avenue where he lived with his Aunt Angelique Cole. He stated that, on Friday, July 30, 1999, he was at his girlfriend, Tashia Harper a/k/a Tashia Barber's apartment at Beechgrove from 10:00 a.m. until noon. Defendant said that his friend, William, picked him up after that. He stated that, on Friday, they went and shot pool in Bridge City, then they went to the Studio on the Westbank Expressway, and then they went to the pool hall. Defendant said he didn't go back to Beechgrove until Sunday at noon. Defendant stated that his purpose for going back on Sunday was to help his girlfriend prepare for her baby shower, and that he and his girlfriend's baby was due on August 11. He said that he first learned about the murder from a girl at the apartment complex on the morning that he gave the statement.
[4] Ms. Harper lived at 958 Beechgrove Boulevard, Apartment D. In his statement, defendant said his girlfriend's last name was Barber. However, defense counsel refers to her as Ms. Harper. It is unclear which name is correct.
[5] This Court did not say whether the person who actually made the statement testified at trial, nor did this Court indicate the substance of the statement.
[6] On November 29, 2000, defendant filed a writ application with this Court requesting that the trial court's denial of his motion to exclude statements made in connection with notice of alibi be reversed. This Court denied defendant's writ application on that same date, stating, "Considering the advanced stage of the testimony taken in these proceedings, we see no reason to exercise our supervisory jurisdiction." State v. Cowart, 00-K-1849 (La.App. 5 Cir. 11/29/00) (unpublished writ disposition). Also on that same date, defendant filed a writ application with the Louisiana Supreme Court regarding the same issue. The supreme court denied the stay and the writ application. State v. Cowart, 00-KD-3227 (La.11/29/00), 776 So.2d 1175 (unpublished writ disposition). On November 30, 2000, this Court recalled the stay order and denied the writ, stating, "The Stay Order earlier issued herein is recalled and set aside. The writ application is denied. We find no abuse of the trial court's discretion." State v. Cowart, 00-K-1854 (La.App. 5 Cir. 11/30/00) (unpublished writ disposition).

On appeal, defendant makes the same argument he made in his writ applications to this Court: that the trial court erred in failing to allow the alibi statement to be withdrawn. The prior denial of supervisory writs does not preclude reconsideration of an issue on appeal, nor does it prevent the appellate court from reaching a different conclusion. State v. Castleberry, 98-1388, p. 5 (La.4/13/99), 758 So.2d 749, 755, cert. denied, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999); State v. Fontenot, 550 So.2d 179 (La.1989).