SUSAN M. CHEHARDY, Chief Judge.
pOn appeal, defendant challenges his convictions and sentences for second degree murder, attempted second degree murder, aggravated burglary, and possession of a firearm by a felon. For the following reasons, we affirm his convictions and sentences for second degree murder, attempted second degree murder, and possession of a firearm by a felon, but remand for correction of patent error in defendant’s sentence for aggravated burglary.

Procedural History

On June 28, 2012, the Jefferson Parish Grand Jury indicted NaKeith Sparkman, defendant-herein, and co-defendant, Michael C. Shelby, on one count of second degree murder, in violation of La. R.S. 14:30.1 (Count 1). Further, Sparkman was also indicted for attempted second degree murder, in violation of La. R.S. 14:27 and 14:30.1 (Count 2); aggravated burglary, in violation of La. R.S. 14:60 (Count 3); and possession of a firearm by a convicted felon, in violation of La. R.S. 14:95.1 (Count 4).
|3On May 7, 8, and 9, 2013, the matter was tried before a twelve-person jury, which found defendant guilty as charged on all counts.[1] Defendant filed a timely motion for new trial, which was denied on May 17, 2013. On May 22, 2013, the trial judge sentenced defendant to consecutive sentences as follows: on Count 1, life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence; on Count 2, 45 years at hard labor; on Count 3, 25 years at hard labor, and, on Count 4, 20 years at hard labor.[2] That same day, defendant filed a timely motion *102 for appeal that was granted. This appeal follows.

Facts

At trial, Shartina Norman testified that, on November 14, 2011, at approximately 8:00 p.m., she was hanging out with her boyfriend, Ranard “Deuce” Brown, Jr., when he got a call from NaKeith Spark-man about purchasing marijuana. After speaking with Mr. Sparkman, Mr. Brown told Ms. Norman that they were going to pick up Mr. Sparkman in Algiers. Mr. Sparkman called Mr. Brown back to tell Mr. Brown not to bring any guns since there would be a lot of people around when they picked him up.
When Mr. Brown and Ms. Norman finally located Mr. Sparkman, he was standing around with five or six guys in the parking lot of an apartment complex. After Mr. Sparkman got into their vehicle, Mr. Brown drove them back to his apartment to pick up marijuana. When they arrived at his apartment complex, Mr. Brown parked away from his apartment in an attempt to conceal its exact location. While Mr. Brown went to his apartment, Ms. Norman and Mr. Sparkman stayed in the car; Ms. Norman had a “bad vibe” that Mr. Sparkman was trying to scout out the exact location of Mr. Brown’s apartment.
| ¿When Mr. Brown returned to the car, he was carrying a backpack, which he put in the vehicle’s trunk. Mr. Brown drove the group to the “W” Hotel to meet Mr. Sparkman’s “friend” that wanted to purchase marijuana. After arriving, Ms. Norman waited in the vehicle while Mr. Brown and Mr. Sparkman went inside. After about 30 minutes, Mr. Brown and Mr. Sparkman returned; Mr. Brown was angry because Mr. Sparkman’s “friend” would not complete the deal. Ms. Norman told Mr. Brown that Mr. Sparkman was setting him up, but Mr. Brown refused to believe it. Not long after, Mr. Brown picked up his cousin, Craig Smith, then dropped Mr. Sparkman off at a gas station on Claiborne.
Craig Smith testified that, after they dropped Mr. Sparkman off, they went to Mr. Brown’s new apartment in Waggaman. Mr. Smith remembered that they arrived at Mr. Brown’s apartment about 9:00 p.m. Ms. Norman testified that, when they got out of the car, she noticed a man, who looked just like one of the men that was “hanging” with Mr. Sparkman earlier in Algiers. She thought that he looked suspicious because he kept looking at them while he talked on a cell phone and paced back and forth in a lot across from Mr. Brown’s apartment. Ms. Norman voiced her concerns but Mr. Brown disregarded her.
After they returned to Mr. Brown’s apartment, Mr. Brown and Mr. Smith smoked marijuana while the three watched a movie.[3] When Mr. Brown and Mr. Smith “got the munchies,” they sent Ms. Norman — with a list typed on Mr. Brown’s cell phone — to “Brother’s Market” for food.
When Ms. Norman returned to the apartment complex, she called Mr. Smith from Mr. Brown’s phone because, as she parked and turned off the lights, she noticed someone move “real fast” away from Mr. Brown’s door. When Mr. Brown opened the door, NaKeith Sparkman was standing on his stoop and came | ^toward him with a gun drawn. A struggle ensued. Once Mr. Brown stepped back into the apartment, Mr. Smith saw Mr. Sparkman *103 pull back and shoot Mr. Brown in the face. Mr. Brown later died as a result of the gunshot wound to his head.
Mr. Smith tried to find a weapon or a way out but he could not. As he knelt on the floor, he asked Mr. Sparkman to spare him, then raised his hand in defense. Mr. Sparkman shot Mr. Smith; the bullet pierced his hand and grazed his scalp. Next, Mr.'Smith played “dead” while Mr. Sparkman rifled through the apartment, looking in the oven and the living room closet. After Mr. Sparkman left without taking anything, Mr. Smith got up and locked the door. Mr. Smith ran into the bathroom while Mr. Brown tried to crawl out of the room.
Ms. Norman testified that, right after she saw Mr. Sparkman shoot “Deuce,” she saw a second man running toward her with a gun so she quickly fled in Mr. Brown’s car.[4] Mr. Smith ultimately left the apartment to try to get help.
Gerard Palisi, who lived at the same apartment complex as Mr. Brown, testified that he was awakened by someone knocking on his door. When he went outside, a young man approached, asking him to call 9-1-1 because he and his friend had been shot. Mr. Palisi called 9-1-1, reported the shootings, and informed the 9-1-1 operator that the injured man said that “Nak-eith” shot them. A little while later, Mr. Palisi went to the street to flag down the sheriffs officers since the building was not clearly marked.
Deputy Timothy Massenburg of the Jefferson Parish Sheriffs Office (“JPSO”) responded to the apartment complex to investigate. When he arrived, the front door of the apartment was ajar and there was blood on the floor in the entryway. Immediately, Deputy Massenburg observed two victims lying on the floor in the main room of the apartment. The officers secured the scene until EMS | ^arrived. Craig Smith told the officers what had happened and identified the shooter as “Nakia Magee.” Mr. Smith identified NaKeith Sparkman, defendant-herein, as the man that had shot him and Mr. Brown from a six-person photographic lineup. Mr. Smith denied that either he or Mr. Brown had a gun during the incident.
Ms. Norman also talked to a JPSO detective and gave statements. Ms. Norman positively identified defendant in a photographic lineup as the man that shot Mr. Brown. At trial, Ms. Norman testified that Mr. Smith did not have a gun, and she did not remember telling police that he had a gun or that there was a gun in the apartment.
Deputy Jamey Perque of the JPSO Crime Scene Division took photographs and collected evidence at the scene. He retrieved two cartridge casings, one projectile, an ammunition magazine, a firearm holster, and various illegal narcotics and narcotics paraphernalia. However, no guns were found in the apartment.
After defendant was arrested and advised of his rights, Detective Solomon Burke of the JPSO took two statements, which were both admitted at trial, from defendant. In his first statement dated November 16, 2011, at 4:45 p.m., defendant stated that, about one hour after they dropped him off at the gas station on Claiborne, Mr. Brown, Mr. Smith and Ms. Norman returned to New Orleans to retrieve defendant to “see if I know the person who was standing outside his house.”
*104 In this statement, defendant declared that Ms. Norman became angry with him and left the apartment to “get her people.” After Ms. Norman left, Mr. Smith choked him while Mr. Brown approached defendant with a small silver handgun, then kicked defendant twice, hit him in the stomach, and stomped on his knee. Defendant wrestled the handgun away from Mr. Brown and shot him and Mr. 17Smith. Defendant claimed that he hid the gun in the complex and that he would show the officers where it was. Defendant denied that he was with anyone else at the time of the incident.
In his second statement, which is dated November 16, 2011, at 6:48 p.m., defendant recounted the events with a more accurate timeline. Defendant denied taking anything from the apartment and denied intending to rob Mr. Brown or Mr. Smith of money or drugs. Defendant said that he shot Mr. Smith because Mr. Smith choked him and he shot Mr. Brown because Mr. Brown “drew down” on him.
Timothy Guillot testified that he was currently incarcerated and serving a 15-year sentence. In November and December of 2011, he had daily contact in parish prison with defendant, whom he identified in court. During that time, defendant told him details regarding the events of this case. Defendant explained that he went to his friend’s house and knocked on the door. When his friend answered the door, defendant pushed in the door, struggled with his friend, then shot his friend in the head.
Defendant also told Mr. Guillot that he shot a second guy that was in the apartment in the hand and the head. Defendant stated that he pilfered marijuana from the kitchen then fled. Later, defendant went to the Calliope project and sold the gun.
Dr. Marianna Sandomirsky, who was accepted as an expert in the field of forensic pathology, performed the autopsy on Mr. Brown. She testified that the cause of Mr. Brown’s death was a gunshot wound to the head. She indicated that the wound was a result of a gun fired in an intermediate range, between about two inches and three feet. She further testified that she was able to recover a copperjjacketed8 projectile during Mr. Brown’s autopsy, which was collected by Kimberly Steirwald, a JPSO crime scene technician.
Jené Rauch, who was accepted as an expert in the field of ballistics and tool mark examination, testified that the two cartridge cases were fired from the same weapon, and the two projectiles were also fired from the same weapon.
The State and the defense also stipulated that on May 25, 2004, defendant was convicted of attempted armed robbery in the 24th Judicial District Court in case number 03-6248. The defense did not call any witnesses. At the close of trial, the twelve-person jury found defendant guilty as charged on all four counts.

Law and Argument

On appeal, defendant assigns three counseled and two pro se assignments of error. In his counseled assignments, defendant argues: first, there was insufficient evidence to support Nakeith Spark-man’s convictions for second degree murder, attempted second degree murder, aggravated burglary, and felon in possession of a firearm; second, the trial court erred in denying a mistrial after a key State witness commented that she had passed a lie detector test; and, third, the trial court violated Nakeith Sparkman’s right to a public trial when it ejected almost all spectators from the courtroom. In his pro se assignments of error, defendant argues that his “due process rights were violated due to the *105 State’s failure to correct [Shartina Norman’s] testimony or the results or the questions presented to Shartina A. Norman during the polygraph examination.”
Counseled Assignments of Error
In his first counseled assignment of error, defendant argues that the State presented insufficient evidence to support his convictions for second degree murder, attempted second degree murder, aggravated burglary; and felon in possession of a firearm. Defendant specifically contends that the State failed to 1nprove beyond a reasonable doubt that he did not act in self-defense when he shot Mr. Brown and Mr. Smith. He further contends that the jury erred in relying on testimony from Mr. Smith and Ms. Norman that was internally contradictory and conflicted with the physical evidence. Regarding his aggravated burglary and firearm possession convictions, defendant argues only “the State, moreover, failed to prove that [defendant] committed an aggravated burglary or possessed a firearm.”
In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or, as in this case, a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).

Second degree murder (Count 1)

Defendant was convicted of second degree murder of Mr. Brown, in violation of La. R.S. 14:30.1. Under that statute, second degree murder is defined as the killing of a human being when the offender: 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even though he has no intent to kill or to inflict great bodily harm. See State v. Lewis, 05-170 (La.App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, writ denied, 06-757 (La.12/15/06), 944 So.2d 1277.
According to the jury instructions, the State prosecuted this case under both theories of murder: specific intent murder and murder while committing or attempting to commit armed robbery.
ImUnder the first theory of second degree murder, the State had to prove that defendant had the specific intent to kill or to inflict great bodily harm. Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). The determination of specific intent is a question of fact. State v. Durand, 07-4 (La.App. 5 Cir. 6/26/07), 963 So.2d 1028, 1034, writ denied, 07-1545 (La.1/25/08), 973 So.2d 753.
Here, Mr. Smith testified that defendant shot Mr. Brown in the head, and defendant admitted in his statement that he shot Mr. Brown. Additionally, Dr. San-domirsky testified that Mr. Brown sustained a lethal gunshot wound to the head. Specific intent to kill may be inferred from a defendant’s act of pointing a gun and firing at a person, State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, 585, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000); State v. Batiste, 06-869 (La.App. 5 Cir. 4/11/07), 958 So.2d 24, 27, and from the extent and severity of the victim’s injuries, State v. Stacker, 02-768 (La.App. 5 Cir. 12/30/02), 836 So.2d 601, 606, writ denied, 03-411 (La.10/10/03), 855 So.2d 327.
*106 Applying the legal principles to the evidence in this case, we find that a rational trier of fact could have found that the State carried its burden of proving beyond a reasonable doubt that defendant acted with specific intent to kill or inflict great bodily harm. Because the evidence is sufficient to convict defendant under the specific intent theory of second degree murder, there is no need to determine whether the State presented sufficient evidence of felony murder.

Attempted second degree murder (Count 2)

Next, defendant was convicted of the attempted second degree murder of Mr. Smith, in violation of La. R.S. 14:27 and 14:30.1. The crime of attempted second degree murder requires proof, beyond a reasonable doubt, of the specific | ^intent to kill a human being and the commission of an overt act in furtherance of that goal. State v. Bannister, 11-602 (La.App. 5 Cir. 2/14/12), 88 So.3d 628, 634, writ denied, 12-628 (La.6/15/12), 90 So.3d 1060. This Court has recognized that although specific intent to inflict great bodily harm is sufficient to support a second degree murder conviction, attempted second degree murder requires a specific intent to kill. Id.
In this case, Mr. Smith testified that he was on his knees pleading with defendant not to kill him when defendant shot him in his hand and in the side of the head. Also, defendant admitted in his statement that he shot Mr. Smith. As noted previously, specific intent to kill may be inferred from a defendant’s act of pointing a gun and firing at a person. Hoffman, supra; Batiste, supra. Applying the legal principles to the evidence adduced at trial, we find that a rational trier of fact could have found beyond a reasonable doubt that the evidence was sufficient to support defendant’s conviction for attempted second degree murder of Mr. Smith.

Self-defense

In this first counseled assignment of error, defendant did not argue that the State failed to prove essential elements of the charged crimes, but rather that the State failed to prove beyond a reasonable doubt that he did not act in self-defense when he shot Mr. Brown and Mr. Smith. When a defendant in a homicide prosecution claims self-defense, the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense. State v. Reed, 11-507 (La.App. 5 Cir. 2/14/12), 88 So.3d 601, 607, writ denied, 12-644 (La.9/14/12), 97 So.3d 1014. However, in non-homicide cases, this Court has found that the defendant has the burden of proof by a preponderance of the evidence that 112his actions were in self-defense. See State v. Nailor, 10-1062 (La.App. 5 Cir. 11/15/11), 78 So.3d 816, 821, unit denied, 11-2780 (La.4/27/12), 86 So.3d 626.[5]
The fact that an offender’s conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct. La. R.S. 14:18. According to La. R.S. 14:20(A)(1), a homicide is justifiable “[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.”
*107 A person who is the aggressor or who brings on a difficulty cannot claim self-defense, unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know his desire is to withdraw and discontinue the conflict. La. R.S. 14:21. In addition, while there is no unqualified duty to retreat, the possibility of escape from an altercation is a recognized factor in determining whether the defendant had a reasonable belief that deadly force was necessary to avoid the danger. State v. King, 11-767 (La.App. 5 Cir. 2/28/12), 88 So.3d 1147, 1153, writ denied, 12-660 (La.9/14/12), 99 So.3d 35.
The jury is the ultimate fact-finder in determining whether the State negated self-defense beyond a reasonable doubt. State v. Sinceno, 12-118 (La.App. 5 Cir. 7/31/12), 99 So.3d 712, 720, writ denied, 12-2024 (La.1/25/13), 105 So.3d 713.
In the instant case, the State presented evidence to negate defendant’s claim of self-defense beyond a reasonable doubt with respect to Mr. Brown. Further, defendant failed to establish by a preponderance of the evidence that he acted in self-defense in shooting Mr. Smith.
11sFirst, Mr. Smith testified that he and Mr. Brown were both unarmed when defendant entered the apartment and shot Mr. Brown in the head without provocation, then turned the gun on him and shot him in the hand and the head. Next, Ms. Norman testified that she witnessed defendant shoot Mr. Smith, who was unarmed, without provocation. Third, Deputy Per-qué testified that a search of the crime scene revealed no firearms. Fourth, Mr. Guillot testified that defendant admitted he pushed the door in, wrestled with his friend, and then shot the friend in the head. Mr. Guillot also testified that defendant admitted that he shot the other “guy” in the hand and in the head.
Defendant, in his statement to the police, stated that he shot Mr. Brown after Mr. Brown pulled a gun on him. He also claimed that he shot Mr. Smith, who had already choked him, before Mr. Smith could get a gun from the kitchen.
The jury heard this conflicting testimony and apparently credited the version of events established by the State’s witnesses. The jury is the ultimate fact-finder in determining whether the State negated self-defense beyond a reasonable doubt. State v. Sinceno, supra. Moreover, the credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056. Based on the foregoing, this argument lacks merit.
Next, defendant argues that the testimony of Mr. Smith and Ms. Norman was internally contradictory and in conflict with the physical evidence. He contends that Mr. Smith’s statement that Mr. Brown had no gun in the apartment was contradicted by Ms. Norman’s statement to police wherein she acknowledged there was a gun in the apartment. Further, Ms. Norman’s claim at trial that the transcription of her statement was inaccurate proved her lack of credibility. 114Pefendant lastly asserts that Mr. Guil-lot’s testimony was not credible since Mr. Guillot admitted at trial that, while in jail, he allied with a relative of the victim, who is defendant’s “enemy.”
A review of the record shows that the jury was made aware of these alleged contradictions and inconsistencies during the direct and cross-examination of the witnesses, but nevertheless, chose to believe the State’s witnesses, which was the *108 jury’s prerogative. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. State v. Rowan, supra. This argument also lacks merit.

Aggravated burglary (Count 3)

By this argument, defendant contends that “the State, moreover, failed to prove that [defendant] committed an aggravated burglary....” Aggravated burglary is the unauthorized entering of any inhabited dwelling with the intent to commit a felony or any theft therein, if the offender is armed with a dangerous weapon, or commits a battery upon any person while in such place, or while entering or leaving the place. La. R.S. 14:60.
First, the State had to prove that defendant committed an unauthorized entry of an inhabited dwelling. Mr. Smith testified that defendant entered the apartment in question by force without consent of the present occupant. The State thus clearly established the elements of unauthorized entry into an inhabited dwelling.
Next, the State had to prove one of the other elements of the crime, including that the offender was armed with a dangerous weapon or committed a battery upon any person while in such place or while entering or leaving the place. Battery is “the intentional use of force or violence upon the person of another.” La. R.S. 14:33. Aggravated battery is defined as “a battery committed with a | ^dangerous weapon.” La. R.S. 14:34. Mr. Smith testified that, after the defendant entered the apartment, defendant shot him. The State presented sufficient evidence to prove that defendant committed an aggravated battery on Mr. Smith while inside the apartment. See State v. Guillard, 04-899 (La.App. 5 Cir. 4/26/05), 902 So.2d 1061, 1070-71, writ denied, OS-1381 (La.1/13/06), 920 So.2d 233.
In the instant case, we find that a rational trier of fact could have found beyond a reasonable doubt that the evidence was sufficient under the Jackson standard to support defendant’s conviction for aggravated burglary.

Possession of a firearm by a convicted felon (Count ⅛)

Defendant contends that “the State, moreover, failed to prove beyond a reasonable doubt that [defendant] ... possessed a firearm.” In order to convict a person of being a convicted felon in possession of a firearm, in violation of La. R.S. 14:95.1, the State must prove: 1) the defendant possessed the firearm; 2) the defendant had a prior conviction for an enumerated felony; 3) the defendant possessed the firearm within ten years of the prior conviction; and 4) the defendant had the general intent to commit the offense. State v. Watson, 08-214 (La.App. 5 Cir. 8/19/08), 993 So.2d 779, 784.
Here, defendant admitted to shooting Mr. Brown and Mr. Smith on the night in question. Additionally, defendant stipulated that, on May 25, 2004, defendant was convicted of attempted armed robbery in the 24th Judicial District Court in case number 03-6248. Thus, defendant admitted that he intended to and did possess a firearm within ten years of his prior felony conviction. As such, the elements of this offense were proven at trial.
Based on the foregoing, we conclude that, the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that the State proved all of the elements of second degree murder, attempted |1(isecond degree murder, aggravated burglary, and felon in possession of a firearm, beyond a *109 reasonable doubt. Further, the State proved beyond a reasonable doubt that defendant did not act in self-defense. Based on the foregoing, we find that this assignment of error lacks merit.
In his second counseled assignment of error, defendant contends that the trial court erred in denying a mistrial after a key State witness commented that she had passed a lie detector test, which improperly bolstered her credibility and damaged his defense.
During co-defendant’s counsel’s cross-examination of Ms. Norman at trial, counsel asked her if the victim, Mr. Brown, had told her to take his gun for protection when she left the apartment around midnight. Ms. Norman denied that Mr. Brown told her to take his gun. She added that detectives had asked her that question also and that she had taken a lie detector test.
Co-defendant’s counsel immediately asked to approach the bench then moved for a mistrial because the witness had mentioned taking a polygraph test. The trial judge remarked that he did not hear the witness mention a polygraph, denied the motion for a mistrial, but offered to admonish the jury that the polygraph test was neither admissible nor evidence. Co-defendant’s counsel declined the admonition, because the jury might not have heard the witness’s non-responsive comment.
Co-defendant’s counsel resumed his cross-examination of Ms. Norman by showing the witness her statement to the police, in which she stated that Mr. Brown had told her to take the gun. At trial, Ms. Norman denied that statement, testifying as follows:
He never said take the gun. When the detectives kept asking me about the same thing you asked me about, they thought I was lying and I |17told them, I asked them, “Can I take a lie detector test,” and I passed it. But I don’t recall him — ever asking me to take no gun.
Co-defendant’s counsel paused and asked the prosecutor to instruct his witness properly, which he did.
On May 16, 2013, defendant filed a motion for new trial, arguing, inter alia, that the trial court erred in denying a mistrial when Ms. Norman said she had taken a polygraph examination and passed it. On that same date, the trial judge heard and denied defendant’s motion for new trial. The trial judge noted that he had offered to admonish the jury, which counsel declined.
Initially, we note that, if an objection has been made when more than one defendant is on trial, it shall be presumed, unless the contrary appears, that the objection has been made by all the defendants. La.C.Cr.P. art. 842. Further, co-defendant’s counsel objected only after Ms. Norman’s first reference to taking a lie detector test; thus, only issues surrounding that reference were preserved for review. La. C.Cr.P. art. 841.
According to La.C.Cr.P. art 775, upon the defendant’s motion, a mistrial shall be ordered, and in a jury trial, the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771. La.C.Cr.P. art. 771 sets forth permissive grounds for requesting an admonition or a mistrial when a prejudicial remark is made on grounds that do not require automatic mistrial under Article 770. State v. Alexander, 12-807 (La.App. 5 Cir. 5/16/13), 118 So.3d 1138, 1152.
A mistrial is a drastic remedy and, except in instances in which a mistrial is mandatory, is warranted only when trial *110 error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial. Whether a mistrial should be granted is within the sound discretion of the trial court and the | ^denial of a motion for mistrial will not be disturbed absent an abuse of that discretion. Id. (citing State v. Smith, 04-340 (La.App. 5 Cir. 10/26/04), 888 So.2d 280, 285).
In State v. Legrand, 02-1462 (La.12/3/08), 864 So.2d 89, cert. denied, 544 U.S. 947, 125 S.Ct. 1692, 161 L.Ed.2d 523 (2005), the Louisiana Supreme Court set forth the law regarding lie detector or polygraph tests:
This Court has long adhered to the view that lie detector or polygraph test results are inadmissible for any purpose at the trial of guilt or innocence in criminal cases. Consistent with this view, the Court has ‘made it clear’ that the rule excluding polygraph evidence ‘also operates to prevent any reference during trial to the fact that a witness has taken a polygraph examination with respect to the subject matter of his testimony.’ Such evidence is prohibited because it ‘invites a probable inference by the jury that the witness passed the polygraph examination and therefore is testifying truthfully.’ Moreover, this Court has held that polygraph information and test results are inadmissible ‘either as substantive evidence or as relating to the credibility of a party or witness.’ However, ‘[ejven though any reference to the results of a polygraph test would be improper, an appellate court will not automatically reverse a conviction whenever an impermissible reference to a polygraph exam is made during a criminal trial.’ A reversal and new trial are required only if there is a reasonable possibility that the error complained of might have contributed to the conviction. [Citations omitted; Emphasis added].
Id. at 98.
In State v. Weatherspoon, 06-539 (La.App. 5 Cir. 12/12/06), 948 So.2d 215, writ denied, 07-462 (La.10/12/07), 965 So.2d 398, the defendant asserted that the trial court erred in failing to grant a mistrial when a State witness testified he took a lie detector test that showed he was not lying when he said he did not shoot a gun during the incident. The defendant testified that the witness was one of the shooters. This Court found that the portion of the witness’s testimony about not possessing a gun at the time of the shooting was corroborated by other evidence, and the witness’s reference to taking a polygraph examination in connection with 119that fact was not prejudicial to the defendant. This Court further found that, because of the overwhelming evidence of the defendant’s guilt, it could not be said that any remarks about the polygraph examination might have contributed to the defendant’s conviction. This Court affirmed the trial court’s denial of a mistrial. Id. at 230-33.[6]
In the instant case, a mistrial was not mandatory because the remark was neither made by a judge, district attorney, or court official, nor a reference to any of the topics prohibited in La.C.Cr.P. art. 770. Thus, we must determine whether the trial judge abused his discretion when he denied the motion for mistrial based on permissive grounds listed in La.C.Cr.P. art. 771.
Here, to bolster his client’s claim of self-defense, co-defendant’s counsel attempted *111 to establish that the victim, Mr. Brown, had a gun on the night of the shooting. To that end, during cross-examination, counsel showed Ms. Norman her statement to the police that Mr. Brown told her to take his gun with her to the store. Ms. Norman denied the accuracy of her statement to the police and stated that she had taken a polygraph test on the issue.
Although we find that Ms. Norman’s reference to her polygraphs test was improper, we find no error in the trial court’s denial of a mistrial after this comment because, as in Weatherspoon, supra, there was no reasonable possibility that the error complained of might have contributed to the conviction.
Here, defendant admitting to shooting both victims in the head. Although defendant contends that his actions were in response to aggression, both Mr. Smith and Ms. Norman testified that they observed defendant, who was armed, catching Mr. Brown unaware and initiating the conflict at Mr. Brown’s front door. Mr. Smith further testified that there was no gun in Mr. Brown’s apartment that he 12f)knew of, that he did not see a gun, that neither he nor Mr. Brown had a gun that night, and that neither he nor Mr. Brown pointed a gun at defendant. Further, the crime scene technician testified that no guns were found at Mr. Brown’s apartment during the investigation on the night in question. This assignment of error lacks merit.
In his third counseled assignment of error, defendant argues that the trial court violated NaKeith Sparkman’s right to a public trial when it ejected almost all spectators from the courtroom. Specifically, defendant contends that the trial judge failed in his obligation to take every reasonable measure to accommodate public attendance at the trial, thus, entitling defendant to a new trial.
First, we note that the event in question was a partial closure of the courtroom, which the trial judge ordered “in the interest of public safety ... except for certain family members” after learning that relatives of the victims and defendants were clashing in the lobby of the courthouse. Further, the partial closure occurred during the testimony of the eleventh and final witness and outside of the presence of the jury.
Most importantly, the transcript of the bench conference regarding this issue reflects that both defendants acquiesced in the partial closure as long as the defendants’ parents and significant others were permitted to stay. Thus, we find that defendant failed to preserve this issue for review by registering an objection.[7] La. C.Cr.P. art. 841(A) (“[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence”); State v. Price, 02-0360 (La.App. 4 Cir. 4/2/03), 842 So.2d 491, 514, writ denied, 03-1322 (La.11/21/03), 860 So.2d 542 and 03-1517 (La.12/12/03), 860 So.2d 1151.
121 Pro Se Assignments of Error
Defendant has filed two pro se briefs containing a similar assignment' of error. In his first brief, defendant argues that his “Due Process rights were violated due to the State allowing ... Shartina A. Norman to testify falsely abut [sic] the polygraph questions she testified to: and State’s failure to correct her testimony.” Specifically, defendant contends that the State failed to turn over the questions asked and the results of the polygraph *112 examination of Ms. Norman by the JPSO. He avers that the State withheld this critical information that was favorable to the defense, in violation of his due process rights under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
In Brady v. Maryland, supra, the United States Supreme Court held that the suppression by the State of evidence favorable to the accused after it receives a request for such evidence violates a defendant’s due process rights where the evidence is material to either guilt or punishment, without regard to the good or bad faith of the prosecutors. See also, State v. Bright, 02-2793 (La.5/25/04), 875 So.2d 37, 41-42. The duty to disclose applies to both exculpatory and impeachment evidence. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); State v. Kemp, 00-2228 (La.10/15/02), 828 So.2d 540, 545. Evidence is “material” under Brady only if there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed to the defense. A reasonable probability is one that is sufficient to undermine confidence in the outcome. United States v. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383.
Brady challenges, like the one asserted in defendant’s pro se supplemental briefs, present fact-based judgments that cannot be adequately first made on appellate review. United States v. Gonzales, 436 F.3d 560, 580 (5th Cir.2006). 19,Brady challenges must be brought to the district court’s attention, winnowed by the trial judge, and made part of the record through a motion for new trial. State v. Wise, 13-247 (La.App. 5 Cir. 11/19/13), 128 So.3d 1220, 1228-30[8] (citing United States v. Chorney, 63 F.3d 78, 80-81 (1st Cir. 1995); United States v. Jones, 112 Fed.Appx. 343, 344 (5th Cir.2004), cert. denied, 543 U.S. 1174, 125 S.Ct. 1369, 161 L.Ed.2d 156 (2005); State v. Chesson, 03-606 (La.App. 3 Cir. 10/1/03), 856 So.2d 166, writ denied 03-2913 (La.2/13/04), 867 So.2d 686).
We find two problems with defendant’s Brady challenge. First, he did not raise this issue at the trial court level so it has not been preserved for review. Assuming arguendo that it had been preserved for review, defendant admits in his brief that “Ms. Norman’s statement, along with the results from the polygraph examination, were disclosed during the course of discovery.” Thus, there was no failure to disclose evidence. This assignment of error lacks merit.
In his second brief, defendant argues that the State knew that Ms. Norman testified falsely because the polygraph examination report reflects that Ms. Norman was not questioned about a gun, which the State failed to correct at trial, in violation of Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).
In Napue, the United States Supreme Court held that, where a prosecutor allows a state witness to give false testimony without correction, a reviewing court must reverse the conviction if the witness’s testimony reasonably Could have affected the jury’s verdict, even if the testimony goes only to the credibility of the witness. Napue, 360 U.S. at 269, 79 S.Ct. at 1177.
To prove a Napue claim, the defendant must show that the prosecutor acted in collusion with the witness to facilitate false testimony. State v. Broadway, 96-2659 (La.10/19/99), 753 So.2d 801, 814. Furthermore, fundamental fairness, i.e., | gjdue process, is offended “when the State, *113 although not soliciting false evidence, allows it to go uncorrected when it appears.” Napue, supra. When false testimony has been given under such circumstances, the defendant is entitled to a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). However, the grant of a new trial based upon a Napue violation is proper only if: (1) the statements at issue are shown to be actually false; (2) the prosecution knew they were false; and (3) the statements were material. United States v. O’Keefe, 128 F.3d 885, 893 (5th Cir.1997).
Again, we find two problems with defendant’s Napue challenge. First, he did not raise this issue at the trial court level so it has not been preserved for review.
Assuming arguendo that it had been preserved for review, we reiterate, as noted in our discussion of defendant’s second counseled assignment of error, that the results of polygraph examinations are inadmissible in Louisiana. State v. Legrand, supra. Moreover and most importantly, the inconsistency that defendant seeks to expose to impeach Ms. Norman was revealed at trial. Ms. Norman’s testimony at trial reflected a discrepancy: her statement to the police immediately after the crime reflected that Mr. Brown spoke with her about a gun but, at trial, she denied speaking about a gun and reported that the transcription of her statement was incorrect. Thus, this assignment of error lacks merit.
ERRORS PATENT
As is our routine procedure, we have reviewed the record for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals an error patent that requires corrective action.
After the trial court imposed sentence on all four counts, defendant orally moved to reconsider sentence on Count 3. The transcript reflects that the trial judge stated, “I’ll strike Count 3,” which indicates that there was no sentence imposed on defendant for Count 3. A court is required to impose a determinate sentence. La. C.Cr.P. art. 879. Accordingly, we remand the case for sentencing on Count 3, defendant’s conviction for aggravated burglary. See, State v. Ditcharo, 98-1374 (La.App. 5 Cir. 7/27/99), 739 So.2d 957, 969-70, writ denied, 99-2551 (La.2/18/00), 754 So.2d 964.

Conclusion

For the foregoing reasons, defendant’s convictions and sentences are affirmed. This matter is remanded to the trial court for correction of the error patent as noted.

CONVICTIONS AFFIRMED; SENTENCES ON COUNTS ONE, TWO, AND FOUR AFFIRMED; REMANDED FOR SENTENCING ON COUNT THREE.

. The jury acquitted co-defendant, Michael Shelby, on the charge of second degree murder.

. Although the jury convicted defendant and the trial judge imposed sentence on Count 3, the trial judge immediately thereafter granted defendant’s motion to reconsider and "struck” the sentence for Count 3. The State did not appeal this ruling. See Errors Patent, infra.

. Mr. Smith explained that Mr. Brown, who sold drugs, had marijuana and Xanax pills in his apartment.

. In March of 2012, Ms. Norman positively identified co-defendant, Michael Shelby, as the man who ran towards her with a gun.

. Whether the State or the defendant bears the burden of establishing that the defendant did or did not act in self-defense in a non-homicide case is unsettled in some circuits. Cf. State v. Jones, 12-510 (La.App. 4 Cir. 6/12/13), 119 So.3d 859, 866; State v. Christof, 12-1995, 2013 WL 2484709, at *3 (La.App. 1 Cir. 6/7/13) (unpublished opinion). See La. C.C.P. art. 2168.

. See also State v. Legrand, supra, and State v. Matthews, 322 So.2d 159 (La.1975), discussed by this Court in Weatherspoon, supra.

. See also, State v. Richardson, 11-1178 (La.App. 1 Cir. 2/13/12), 2012 WL 440410, at *10-11, writ denied, 12-538 (La.9/12/12), 98 So.3d 818 (no violation of right to public trial when no objection was made to the closure of the courtroom).

. It is noted that this opinion has not been released for publication in the permanent law reports and until released, it is subject to revision or withdrawal.